UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RICKEY I. KANTER,

                Plaintiff,

      v.

LORETTA ELIZABETH LYNCH,
Attorney General of the United States,
and
BRAD SCHIMEL,
Attorney General of the State of Wisconsin,

                Defendants.

Case No. _____

## COMPLAINT

Plaintiff Rickey I. Kanter, by and through undersigned counsel, complains of Defendants as follows:

## PARTIES

1. Plaintiff Rickey I. Kanter is a natural person and citizen of Wisconsin and of the United States, residing in Mequon, Ozaukee County, Wisconsin. Mr. Kanter desires to purchase and possess a firearm as permitted by the Second Amendment to the United States Constitution, but is prevented from doing so because of Defendants' anticipated enforcement of the federal and state felon-in-possession laws complained of herein and the listing of his name in the National Instant Criminal Background Check System. *See* 18 U.S.C. § 922(g)(l); Wis. Stat. § 941.29(1m).

2. Defendant Loretta Lynch is sued in her capacity as the Attorney General of the United States. As Attorney General, Mrs. Lynch is responsible for executing and administering

the laws and policies of the United States, and is presently enforcing the laws and policies of the United States that are the subject of this action.

3.      Defendant Brad Schimel is sued in his capacity as the Attorney General of the State of Wisconsin.  As Attorney General, Mr. Schimel is responsible for executing and administering the laws and policies of the State of Wisconsin, and is presently enforcing the laws and policies of Wisconsin that are the subject of this action.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1346.

5.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b), (e)(1)(B) and (C), as a substantial part of the events giving rise to the claim occurred, and the Plaintiff resides, in this judicial district.

## STATEMENT OF FACTS

*Plaintiff's Background*

6.      Rickey I. Kanter is a businessman, husband, and father who resides in Mequon, Wisconsin.

7.      Mr. Kanter is over the age of 21, is not under indictment, has never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive from justice, is not an unlawful user of or addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a restraining order relating to an intimate partner.

8.      Mr. Kanter has been convicted of only one crime in his lifetime.

2

9.     On May 24, 2011, Mr. Kanter pled guilty to one count of mail fraud under 18 U.S.C. § 1341.  The alleged underlying offense ended in March 2006.

10.     Judgment was imposed against Mr. Kanter on September 15, 2011, and he was sentenced to an imprisonment term of twelve months and one day.  A true and correct copy of the Judgment in a Criminal Case, Case No. 11-CR-80 in the District Court for the Eastern District of Wisconsin, is attached hereto as Exhibit A.  Mr. Kanter served his sentence.

11.      Mr. Kanter was also ordered to pay criminal monetary penalties including a $50,000 fine and a $100 assessment, *see* Exhibit A, which he did.

12.     Mr. Kanter's conviction involved no violent or drug-related activity.

*Factual Basis of Mr. Kanter's Felony Mail Fraud Conviction*

13.     As part of the Plea Agreement filed on April 11, 2011, in Mr. Kanter's criminal case, Mr. Kanter and the United States acknowledged that if the case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt.  *See* Exhibit B, a true and correct copy of the Plea Agreement entered into between Mr. Kanter and the United States on April 11, 2011, at pages 6–9.  Following are quoted relevant portions of the Plea Agreement:

13(a)     At all times relevant, Rickey I. Kanter was a resident of Mequon, Wisconsin and was the owner, operator, and chief executive officer of Rikco International, LLC. Rikco International, LLC was a Wisconsin limited liability company, doing business as Dr. Comfort (hereinafter referred to as "Dr. Comfort"), with its principal place of business located in Mequon, Wisconsin. Dr. Comfort manufactured, marketed and sold therapeutic shoes and inserts for therapeutic shoes that were intended for use primarily by individuals with diabetes and severe foot disease. Dr. Comfort marketed and sold therapeutic shoes and inserts primarily to podiatrists, who, in turn, sold the shoes and inserts to individual consumers. The majority of therapeutic shoes and inserts sold by Dr. Comfort were ultimately billed to and paid for by the Medicare Program.

13(b)     Sen Tang Huang ("Huang"), who is also known as "Scott," is a Chinese citizen who served as Dr. Comfort's primary contact with and communicator to the

manufacturing and design companies in China that created Dr. Comfort therapeutic shoes and inserts.

13(c)   Medicare Program was and is a federally subsidized and administered health insurance program for persons who are age 65 or older, and certain individuals who are disabled. In this indictment, the federal agencies, contractors, and entities through which the Medicare Program was administered and operated are collectively referred to as Medicare. Under appropriate circumstances, Medicare paid for certain therapeutic shoes and inserts for qualifying Medicare beneficiaries with diabetes who had severe foot disease. As is relevant here, Medicare would only pay for prefabricated inserts if they could be molded after heating and formed to a patient's foot to maintain total contact with the foot.

13(d)   In January 2004, Medicare issued new requirements concerning the circumstances under which it would pay for inserts. Under these requirements, Medicare would only pay for heat-moldable inserts if the base layer of the inserts met specific minimum thickness and hardness standards. These requirements became effective July 1, 2004.

13(e)   To facilitate compliance with these new requirements, Medicare encouraged manufacturers and suppliers to submit samples of their inserts to Medicare to verify that the inserts satisfied the new standards. Under this review procedure, Medicare evaluated inserts to determine whether they met the minimum thickness and hardness requirements. Based on this evaluation, Medicare assigned a specific billing code indicating whether the inserts met or failed Medicare's requirements and, therefore, whether Medicare would pay for the inserts.

13(f)   In April 2004, Dr. Comfort sought verification from Medicare that two models of heat-moldable inserts it intended to sell met Medicare's new standards. One of the models was called an "Elite XtraS" insert. Dr. Comfort provided Medicare with samples of the inserts, as well as a description of the materials and manufacturing process for them. Medicare determined that the base layer of Dr. Comfort's inserts were too thin to meet Medicare's new standards and, therefore, assigned the inserts a billing code indicating Medicare would not pay for them. On June 14, 2004, Medicare notified Dr. Comfort of this decision.

13(g)   Beginning on July 1, 2004, and despite being informed that its inserts failed to meet Medicare's standards, Dr. Comfort marketed and sold the rejected Elite XtraS inserts and falsely and fraudulently represented that the inserts were "Medicare Covered" and eligible for payment by Medicare. On July 1, 2004, Dr. Comfort asked Medicare to review its decision concerning its Elite XtraS inserts. Dr. Comfort falsely represented to Medicare that the sample inserts it had initially submitted were "pre-production samples." Dr. Comfort also submitted revised samples of the Elite XtraS inserts that had a thicker base layer, as well as a revised description of the materials and manufacturing process for the inserts.

13(h)   Medicare determined that the revised insert samples satisfied Medicare's requirements and, therefore, assigned them a billing code indicating Medicare would pay for them. On September 20, 2004, Medicare notified Dr. Comfort of this decision. Dr. Comfort, however, did not sell the revised inserts approved by Medicare. Instead, Dr. Comfort continued to sell the inserts that had not been approved by Medicare. Relying on the approval it obtained from Medicare, Dr. Comfort marketed the non-approved inserts as "Medicare covered." Dr. Comfort also provided customers with instructions on how to bill Medicare for the inserts even though the inserts did not meet Medicare's standards.

13(i)   On or about January 10, 2006, Dr. Comfort's Chief Operating Officer ("COO") resigned. In connection with his resignation, the COO informed Kanter and lawyers for Dr. Comfort that Dr. Comfort had been selling heat-moldable inserts that did not comply with Medicare's standards to be eligible for payment.

13(j)   Despite being advised by his lawyers to stop selling the non-compliant inserts, Kanter continued to market and sell heat-moldable inserts that failed to comply with Medicare's requirements Dr. Comfort continued to represent that the inserts were "Medicare covered" and eligible for payment by Medicare.

13(k)   During January and February 2006, Kanter worked with Huang, who was in federal custody, to design a new version of heat-moldable inserts to replace the non-compliant inserts Dr. Comfort continued to sell. The new insert designed by Kanter and Huang had a thicker base layer to meet Medicare's requirements. Kanter and Huang, however, reduced the thickness of the top layer of the new inserts. As a result, the overall thickness of the new inserts was less than the inserts submitted to and approved by Medicare. These new inserts were not received by Dr. Comfort until March 17, 2006. In the interim, Dr. Comfort continued to sell non-compliant inserts.

13(l)   On March 23, 2006, federal agents executed search warrants at the business premises of Dr. Comfort located in Mequon, Wisconsin. Federal agents located and seized thousands of inserts at Dr. Comfort that failed to meet Medicare's requirements to be eligible for payment.

13(m)   Shortly after the search, Kanter spoke to Huang and discussed why Dr. Comfort had marketed and sold inserts that failed to comply with Medicare's requirements. On or about March 29, 2006, Huang contacted his wife, who was in China, by telephone. During this conversation, Huang asked his wife to obtain a letter from the manufacturer of the inserts sold by Dr. Comfort providing an explanation as to why Dr. Comfort had marketed and sold inserts that failed to comply with Medicare's requirements.

13(n)   At the request of Huang's wife, the Chinese manufacturer provided a letter advising that in October 2005, the manufacturer moved its factory and molds used to produce the inserts were "carelessly mixed." On or about August 3, 2006,

counsel for Kanter provided a copy of that letter to the United States Attorneys Office.

13(o)   Throughout 2007 and 2008, counsel for Kanter conducted an investigation of the Chinese manufacturer of inserts for Dr. Comfort. Counsel and investigators conducted telephone interviews and went to China to meet with representatives of the manufacturer and obtain records relevant to the heat moldable inserts shipped during the subject time period. According to the representatives of the manufacturer, several different insert molds had been designed and that the manufacturer may have mixed molds during a move of the factory that occurred in approximately December 2004. Counsel, however, did not locate any molds, or other documentation such as blueprints for molds, consistent with the inserts that Dr. Comfort submitted to Medicare in 2004 that were ultimately approved.

13(p)   The results of that investigation were provided to the United States Attorneys Office by Kanter's counsel at various times in 2008.

13(q)   As a result of Kanter's scheme, Dr. Comfort received approximately $375,000 in payment for non-compliant inserts it sold during the period January 2006 through March 2006 that were billed to and paid for by Medicare.

13(r)   The specific charge to which Kanter [pled] guilty is based on a shipment of non-compliant heat-moldable inserts that were shipped by Dr. Comfort on March 7, 2006, to a podiatrist in Bradenton, Florida using a commercial interstate carrier. The inserts, which Kanter knew did not meet Medicare's standards, were nonetheless billed to and paid for by Medicare.

14.   The charge to which Mr. Kanter pled guilty, and of which he was convicted, is a felony.  He was sentenced to confinement of a year and a day.

*Prohibitions on the Possession of Firearms by Felons*

15.   Title 18, United States Code § 922(g)(l) prohibits the possession of firearms by any person convicted of "a crime punishable by imprisonment for a term exceeding one year." Violation of this provision is a felony criminal offense punishable by fine and imprisonment of up to ten years. *See* 18 U.S.C. § 924(a)(2).

16.   Wisconsin Statutes section 941.29 prohibits the possession of a firearm by any person convicted of a felony in Wisconsin or of a crime elsewhere that would be a felony if

committed in Wisconsin. Violation of this statute is a Class G felony criminal offense. *See* Wis.

Stat. § 941.29(1m).

17.     Mr. Kanter's non-violent felony conviction, for which he was sentenced to an

imprisonment term of a year and a day, disabled him from possessing firearms, pursuant to

Title 18, United States Code § 922(g)(l) and Wisconsin Statutes section 941.29.

*Plaintiff's Desire to Possess a Firearm*

18.     Mr. Kanter desires and intends to possess a firearm for legal purposes.

19.     The only reason Mr. Kanter has refrained from obtaining a firearm is because he

is prohibited from doing so by the federal and state felon-in-possession laws referenced above.

20.     Thus, Mr. Kanter suffers the ongoing harm of being unable to obtain a firearm

from licensed firearms dealers, which Mr. Kanter would do but for the enforcement of 18 U.S.C.

§ 922(g)(l) and Wisconsin Statutes section 941.29.

**COUNT ONE**
**AS-APPLIED CONSTITUTIONAL CLAIM FOR RELIEF**
**RIGHT TO KEEP AND BEAR ARMS, U.S. CONST. AMEND. II**

21.     The allegations of paragraphs 1 through 20 are incorporated as though fully set

forth herein.

22.     Mr. Kanter is a responsible, law-abiding American citizen. He has no history of

violent behavior, or of any other conduct that would suggest he would pose any more danger by

possessing a firearm than an average, law-abiding, responsible citizen. Mr. Kanter is not likely

to act in a manner dangerous to public safety, and his possession of a firearm would not be

contrary to the public interest.

23.     On account of Mr. Kanter's unique personal circumstances, including but not

limited to the nature of his non-violent felony conviction, the passage of time since that

conviction, his generally law-abiding record throughout his life, his trustworthiness with

7

firearms, and the lack of danger that his possession of a firearm would pose, it is unconstitutional to apply against Mr. Kanter, personally, the firearms prohibitions of 18 U.S.C. § 922(g)(l) and Wisconsin Statutes section 941.29.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendants as follows:

A. A declaration that application of 18 U.S.C. § 922(g)(l) against Rickey I. Kanter, on account of his 2011 felony conviction for mail fraud, violates the Second Amendment to the United States Constitution;

B. A declaration that application of Wisconsin Statutes section 941.29 against Rickey I. Kanter, on account of his 2011 conviction for mail fraud, violates the Second Amendment to the United States Constitution;

C. An order permanently enjoining Defendants, and their officers and agents, from enforcing 18 U.S.C. § 922(g)(l) and Wisconsin Statutes section 941.29 against Rickey I. Kanter on the basis of his 2011 felony conviction for wire fraud;

D. And order removing Rickey I. Kanter's name from the National Instant Criminal Background Check System as someone ineligible to purchase firearms;

D. Costs of suit;

E. Attorney Fees and Costs pursuant to 28 U.S.C. § 2412; and

F. Any other further relief as the Court deems just and appropriate.

Dated this 22nd day of August, 2016.

s/Mark A. Cameli
Mark A. Cameli
WI State Bar ID No. 1012040
mcameli@reinhartlaw.com
Kate E. Maternowski
WI State Bar ID No. 1091126
kmaternowski@reinhartlaw.com
Attorneys for Rickey I. Kanter
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965
Telephone: 414-298-1000
Facsimile: 414-298-8097

34234331