UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RICKEY I. KANTER,

                        Plaintiff,

        v.

LORETTA ELIZABETH LYNCH,                          Case No. 16-CV-1121
Attorney General of the United States,
and
BRAD SCHIMEL,
Attorney General of the State of Wisconsin,

                        Defendants.

## MEMORANDUM OF LAW
## IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
## IN OPPOSITION TO DEFENDANTS' DISPOSITIVE MOTIONS

Plaintiff Rickey Kanter, by his attorneys, Reinhart Boerner Van Deuren, s.c., hereby

submits this Memorandum in Support of his Motion for Summary Judgment and in Response to

the Motion to Dismiss and Motion for Judgment on the Pleadings filed by Defendant Lynch and

Defendant Schimel, respectively.

### INTRODUCTION

Rickey Kanter is a family man and business owner.  He is not a violent criminal.  He has

never been arrested for or convicted of a violent offense; in fact, apart from the fraud conviction

that put a felony on his record and made him ineligible to own a firearm, he has no criminal

history whatsoever.  Now he seeks to purchase a firearm for the protection of himself, his family,

and his home, but is precluded from doing so because state and federal dispossession laws make

it a crime for any felon to possess a firearm.  Of course all criminal offenses, including Kanter's,

involve lamentable conduct. But not every offense, and in particular Kanter's non-violent fraud offense, warrants a permanent lifetime prohibition on the exercise of a fundamental Second Amendment right.

Following the Supreme Court's decisions in *Heller* and *McDonald* recognizing individuals' constitutional right to gun ownership, the Seventh Circuit has had occasion to consider the constitutionality of several firearm regulations, including felon dispossession laws. Several felons with violent offenses on their records have brought challenges, and the Seventh Circuit has held in those cases that dispossession laws pass constitutional scrutiny, because keeping guns away from those with a violent criminal history and a propensity to commit violent acts in the future serves the government's objective of preventing future violent crime. *See, e.g, United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). But the Seventh Circuit specifically left open the possibility of a successful constitutional challenge to the felon dispossession law brought by a non-violent offender, because the law could be overbroad as applied to such offenders. *Id.*

In order for the felon dispossession laws to satisfy constitutional scrutiny, the Government Defendants[1] here must show that the laws are substantially related to the objective of promoting public safety and preventing violent crime. But they did not, and cannot, point to evidence that non-violent white-collar offenders like Kanter are likely to commit violent acts following their felony convictions. Disarming Kanter is not related, let alone substantially related, to the goal of preventing violent misuse of guns in the future, and therefore the state and federal felon dispossession laws that Kanter challenges with this action are unconstitutional as applied to him.

---

[1] Kanter refers herein to Defendants Lynch (the United States Attorney General) and Schimel (the Wisconsin Attorney General) collectively as the "Government Defendants."

**FACTUAL BACKGROUND**

Though the parties disagree on the law, the relevant facts are few and beyond dispute. The following facts are contained entirely within Kanter's Complaint.

Rickey Kanter is a husband, father, and businessman residing in Mequon, Wisconsin, who wishes to purchase and possess a firearm for legal purposes. (Statement of Proposed Material Facts [hereinafter "SPMF"] ¶ 1.) Kanter is over the age of 21, is not under indictment, has never been convicted of a felony or misdemeanor crime of domestic violence, is not a fugitive from justice, is not an unlawful user of or addicted to any controlled substance, has not been adjudicated a mental defective or committed to a mental institution, has not been discharged from the Armed Forces under dishonorable conditions, has never renounced his citizenship, and has never been the subject of a restraining order relating to an intimate partner. (SPMF ¶ 2.)

Kanter has been convicted of only one crime in his lifetime. (SPMF ¶ 3.) On May 24, 2011, Kanter pled guilty to one count of mail fraud under 18 U.S.C. § 1341 for an alleged underlying offense that ended in March 2006. (SPMF ¶ 4.) As part of the Plea Agreement filed on April 11, 2011, in Kanter's criminal case, Kanter and the United States acknowledged that if the case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt:

> At all times relevant, Rickey I. Kanter was a resident of Mequon, Wisconsin and was the owner, operator, and chief executive officer of Rikco International, LLC. Rikco International, LLC was a Wisconsin limited liability company, doing business as Dr. Comfort (hereinafter referred to as "Dr. Comfort"), with its principal place of business located in Mequon, Wisconsin. Dr. Comfort manufactured, marketed and sold therapeutic shoes and inserts for therapeutic shoes that were intended for use primarily by individuals with diabetes and severe foot disease. Dr. Comfort marketed and sold therapeutic shoes and inserts primarily to podiatrists, who, in turn, sold the shoes and inserts to individual consumers. The majority of therapeutic shoes and inserts sold by Dr. Comfort were ultimately billed to and paid for by the Medicare Program.

3

Sen Tang Huang ("Huang"), who is also known as "Scott," is a Chinese citizen who served as Dr. Comfort's primary contact with and communicator to the manufacturing and design companies in China that created Dr. Comfort therapeutic shoes and inserts.

Medicare Program was and is a federally subsidized and administered health insurance program for persons who are age 65 or older, and certain individuals who are disabled. In this indictment, the federal agencies, contractors, and entities through which the Medicare Program was administered and operated are collectively referred to as Medicare. Under appropriate circumstances, Medicare paid for certain therapeutic shoes and inserts for qualifying Medicare beneficiaries with diabetes who had severe foot disease. As is relevant here, Medicare would only pay for prefabricated inserts if they could be molded after heating and formed to a patient's foot to maintain total contact with the foot.

In January 2004, Medicare issued new requirements concerning the circumstances under which it would pay for inserts. Under these requirements, Medicare would only pay for heat-moldable inserts if the base layer of the inserts met specific minimum thickness and hardness standards. These requirements became effective July 1, 2004.

To facilitate compliance with these new requirements, Medicare encouraged manufacturers and suppliers to submit samples of their inserts to Medicare to verify that the inserts satisfied the new standards. Under this review procedure, Medicare evaluated inserts to determine whether they met the minimum thickness and hardness requirements. Based on this evaluation, Medicare assigned a specific billing code indicating whether the inserts met or failed Medicare's requirements and, therefore, whether Medicare would pay for the inserts.

In April 2004, Dr. Comfort sought verification from Medicare that two models of heat-moldable inserts it intended to sell met Medicare's new standards. One of the models was called an "Elite XtraS" insert. Dr. Comfort provided Medicare with samples of the inserts, as well as a description of the materials and manufacturing process for them. Medicare determined that the base layer of Dr. Comfort's inserts were too thin to meet Medicare's new standards and, therefore, assigned the inserts a billing code indicating Medicare would not pay for them. On June 14, 2004, Medicare notified Dr. Comfort of this decision.

Beginning on July 1, 2004, and despite being informed that its inserts failed to meet Medicare's standards, Dr. Comfort marketed and sold the rejected Elite XtraS inserts and falsely and fraudulently represented that the inserts were "Medicare Covered" and eligible for payment by Medicare. On July 1, 2004, Dr. Comfort asked Medicare to review its decision concerning its Elite XtraS inserts. Dr. Comfort falsely represented to Medicare that the sample inserts it had initially submitted were "pre-production samples." Dr. Comfort also submitted revised samples of the Elite XtraS inserts that had a thicker base layer, as well as a revised description of the materials and manufacturing process for the inserts.

Medicare determined that the revised insert samples satisfied Medicare's requirements and, therefore, assigned them a billing code indicating Medicare would pay for them. On September 20, 2004, Medicare notified Dr. Comfort of this decision. Dr. Comfort, however, did not sell the revised inserts approved by Medicare. Instead, Dr. Comfort continued to sell the inserts that had not been approved by Medicare. Relying on the approval it obtained from Medicare, Dr. Comfort marketed the non-approved inserts as "Medicare covered." Dr. Comfort also provided customers with instructions on how to bill Medicare for the inserts even though the inserts did not meet Medicare's standards.

On or about January 10, 2006, Dr. Comfort's Chief Operating Officer ("COO") resigned. In connection with his resignation, the COO informed Kanter and lawyers for Dr. Comfort that Dr. Comfort had been selling heat-moldable inserts that did not comply with Medicare's standards to be eligible for payment.

Despite being advised by his lawyers to stop selling the non-compliant inserts, Kanter continued to market and sell heat-moldable inserts that failed to comply with Medicare's requirements Dr. Comfort continued to represent that the inserts were "Medicare covered" and eligible for payment by Medicare.

During January and February 2006, Kanter worked with Huang, who was in federal custody, to design a new version of heat-moldable inserts to replace the non-compliant inserts Dr. Comfort continued to sell. The new insert designed by Kanter and Huang had a thicker base layer to meet Medicare's requirements. Kanter and Huang, however, reduced the thickness of the top layer of the new inserts. As a result, the overall thickness of the new inserts was less than the inserts submitted to and approved by Medicare. These new inserts were not received by Dr. Comfort until March 17, 2006. In the interim, Dr. Comfort continued to sell non-compliant inserts.

On March 23, 2006, federal agents executed search warrants at the business premises of Dr. Comfort located in Mequon, Wisconsin. Federal agents located and seized thousands of inserts at Dr. Comfort that failed to meet Medicare's requirements to be eligible for payment.

Shortly after the search, Kanter spoke to Huang and discussed why Dr. Comfort had marketed and sold inserts that failed to comply with Medicare's requirements. On or about March 29, 2006, Huang contacted his wife, who was in China, by telephone. During this conversation, Huang asked his wife to obtain a letter from the manufacturer of the inserts sold by Dr. Comfort providing an explanation as to why Dr. Comfort had marketed and sold inserts that failed to comply with Medicare's requirements.

At the request of Huang's wife, the Chinese manufacturer provided a letter advising that in October 2005, the manufacturer moved its factory and molds used to produce the inserts were "carelessly mixed." On or about August 3, 2006, counsel for Kanter provided a copy of that letter to the United States Attorneys Office.

Throughout 2007 and 2008, counsel for Kanter conducted an investigation of the Chinese manufacturer of inserts for Dr. Comfort. Counsel and investigators conducted telephone interviews and went to China to meet with representatives of the manufacturer and obtain records relevant to the heat moldable inserts shipped during the subject time period. According to the representatives of the manufacturer, several different insert molds had been designed and that the manufacturer may have mixed molds during a move of the factory that occurred in approximately December 2004. Counsel, however, did not locate any molds, or other documentation such as blueprints for molds, consistent with the inserts that Dr. Comfort submitted to Medicare in 2004 that were ultimately approved.

The results of that investigation were provided to the United States Attorneys Office by Kanter's counsel at various times in 2008.

As a result of Kanter's scheme, Dr. Comfort received approximately $375,000 in payment for non-compliant inserts it sold during the period January 2006 through March 2006 that were billed to and paid for by Medicare.

The specific charge to which Kanter [pled] guilty is based on a shipment of non-compliant heat-moldable inserts that were shipped by Dr. Comfort on March 7, 2006, to a podiatrist in Bradenton, Florida using a commercial interstate carrier. The inserts, which Kanter knew did not meet Medicare's standards, were nonetheless billed to and paid for by Medicare.

(SPMF ¶ 5(a)–(r).)

Judgment was imposed against Kanter on September 15, 2011, and he was sentenced to an imprisonment term of twelve months and one day. (SPMF ¶ 6.) Kanter served his sentence and paid criminal monetary penalties. (SPMF ¶ 7.)

Kanter's non-violent felony conviction disables him from possessing firearms for life, pursuant to Title 18 United States Code § 922(g)(l) and Wisconsin Statutes section 941.29.[2]

## LEGAL STANDARD

In this Memorandum of Law, Kanter both moves for Summary Judgment on his claim and opposes the Motions to Dismiss and for Judgment on the Pleadings filed by Defendants Lynch and Schimel, respectively.

---

[2] For the sake of brevity, Kanter refers to the Wisconsin law and federal law as, collectively, "felon dispossession laws" or "felon-in-possession laws." The Seventh Circuit has acknowledged that the two laws are equivalent for the purposes of a Second Amendment challenge. *See Baer v. Lynch*, 636 F. App'x 695, 698–99 (7th Cir. 2016).

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a)-(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "It is well accepted that the purpose of summary judgment is to prevent an unnecessary trial where, on the basis of the pleadings and supporting documents, there remains no material issue of fact to be tried." *Dreher v. Sielaff*, 636 F.2d 1141, 1143 n.4 (7th Cir. 1980).  To defeat a motion for summary judgment, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Cincinnati Life Ins. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013) (citations omitted).

The legal standard for resolving a Rule 12(c) Motion for Judgment on the Pleadings is the same as for a Rule 12(b)(6) Motion to Dismiss. *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 & n.3 (7th Cir. 1998).  Neither motion should be granted unless "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *Id.* at 452 (citation omitted). The Court must accept as true the allegations of the non-moving party, view the facts in the light most favorable to the non-moving party, and draw all inferences in favor of the non-moving party.  *GATX Leasing Corp. v. Nat'l Union Fire Ins.*, 64 F.3d 1112, 1114 (7th Cir. 1995).

### ARGUMENT

As with any law that burdens a constitutional right, the government must prove that felon dispossession laws, which burden individuals' Second Amendment rights, pass constitutional scrutiny.  The federal and state felon dispossession laws challenged here, 18 United States Code Section 922(g)(1) and Wisconsin Statutes section 941.29(1m), cannot pass intermediate scrutiny as applied to Kanter, a generally law-abiding individual who committed a non-violent offense for which he has served his sentence and paid his fine.  However proper felon dispossession laws

might generally be as applied to violent felons, persisting in barring Kanter's access to firearms on the basis of his non-violent felony conviction violates his Second Amendment rights.

I.      **The Second Amendment Provides an Individual Right to Gun Possession That Can be Burdened Only if the Government Can Show that the Burdening Law Passes Constitutional Scrutiny.**

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II.  In *District of Columbia v. Heller*, the United States Supreme Court held that the right enshrined in the Second Amendment is an individual (rather than collective) right which is not conditional upon one's service in the militia. 554 U.S. 570, 595 (2008).

Subsequently, in *McDonald v. City of Chicago,* where the Court held that the Second Amendment applies to the states as well as the federal government, the Court explained that its earlier opinion in *Heller* "point[ed] unmistakably" toward the conclusion that the right to keep and bear arms is fundamental to our scheme of ordered liberty and deeply rooted in this nation's history and tradition. 561 U.S. 742, 744 (2010).  The Court in *McDonald* described the "central holding" of its *Heller* opinion: "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald,* 561 U.S. at 780.

Following the Supreme Court's rulings in *Heller* and *McDonald* that the Second Amendment includes an individual right to gun ownership, the Seventh Circuit confirmed that any government regulation that burdens an individual's right to own a firearm must pass constitutional scrutiny. Felon-in-possession laws are no exception.  Though the *Heller* Court acknowledged the "presumptive validity" of felon gun dispossession statutes, the government

must prove the constitutionality of such laws when faced with an as-applied challenge. *Williams*, 616 F.3d at 692 ("[T]he government does not get a free pass simply because Congress has established a 'categorical ban'; it still must prove that the ban is constitutional, a mandate that flows from *Heller* itself. *Heller* referred to felon disarmament bans only as 'presumptively lawful,' which, by implication, means that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge. Therefore, putting the government through its paces in proving the constitutionality of § 922(g)(1) is only proper."); *see also Baer v. Lynch*, 636 F. App'x 695, 697 (7th Cir. 2016) ("We have left open the possibility that a felon might be able to rebut that presumption by showing that a ban on possession is overbroad as applied to him.").

The Seventh Circuit's recognition that individuals may bring as-applied challenges to Section 922(g)(1) is also consistent with the legislative history of the relationship between the felon dispossession statute and Section 925(c), which was enacted by the same Congress and provides for as-applied relief for individuals who show that "the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). Federal district courts can review the denial of relief under this provision. *Id.* Congress has halted the federal government from expending any funds to process such claims for relief, and therefore individuals in Kanter's position are left to pursue as-applied relief in the courts.[3]

---

[3] A felon may "apply to the Attorney General of the United States for exclusion from the federal ban, which in turn relieves him from the Wisconsin ban, though Congress has undermined the practical availability of this form of relief by refusing to fund its implementation." *Baer*, 636 F. App'x at 699 n.1 (citing 18 U.S.C. § 925(c); Wis. Stat. § 941.29(5)(b); *Logan v. United States,* 552 U.S. 23, 28 n.1 (2007); *United States v. Bean,* 537 U.S. 71, 73 (2002); *United States v. Miller,* 588 F.3d 418, 420 (7th Cir. 2009); *Schrader v. Holder,* 704 F.3d 980, 982, 992 (D.C. Cir. 2013)).

Both the federal and state government Defendants argue that Kanter is categorically precluded from bringing a constitutional challenge that forces the governments to prove their felon dispossession laws pass scrutiny simply because he has been convicted of a felony.  (Lynch Br. at 5–9; Schimel Br. at 8–18.)  But the Seventh Circuit has already dispelled of this argument. *Williams*, 616 F.3d at 692–93 (applying intermediate scrutiny to Section 922(g)(1) when challenged by a felon).  Earlier this year, the Seventh Circuit explained that when faced with Second Amendment challenges, this circuit has not, like some other circuits have, focused on whether "felons historically were outside the scope of the Second Amendment's protection," but "instead have focused on whether § 922(g)(1) survives intermediate scrutiny."  *Baer*, 636 F. App'x at 698.

Other circuits have similarly held that, when faced with an as-applied Second Amendment challenge by a felon to a law burdening an individual's gun ownership right, courts are to evaluate the law under some form of heightened constitutional scrutiny.  *See, e.g.*, *United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011) ("[G]iven the 'presumptively lawful' reference in *Heller*—the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban. Possibly it might even be open to highly fact-specific objections."); *see also United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012); *Schrader v. Holder*, 704 F.3d 980, 989–90 (D.C. Cir. 2013). Courts attempting to reconcile *Heller*'s "presumptively lawful" language with the traditional analysis accompanying constitutional scrutiny have considered whether prohibitions on felons are presumptively lawful because they do not burden persons within the ambit of the Second Amendment as historically understood, or whether the regulations presumptively satisfy some form of heightened means-end scrutiny (which can be challenged as applied).  *See Tyler v.*

*Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 690 (6th Cir. 2016) (considering the statute section that disarms the mentally ill, but discussing the disarmament of felons as well). As the Seventh Circuit impliedly found in *Williams* by undertaking the analysis of constitutional scrutiny, and as the Sixth Circuit recently held in its *en banc Tyler* opinion, "[u]ltimately, the latter understanding is the better option." *Id.*

The Government Defendants here seek to cut the proper analysis in half by ignoring inconvenient Seventh Circuit precedent that recognizes individual gun ownership as Second Amendment conduct and calls for governments to make a showing sufficient to satisfy intermediate scrutiny to defend a law that burdens such conduct.[4] The Government Defendants offer a circular theory by which any legislative act that might violate the Second Amendment is self-constitutionalizing. (Lynch Br. at 5) ("Plaintiff's felony conviction categorically excludes him from the protection of the Second Amendment."); (Schimel Br. at 11) ("Simply put, Kanter committed a felony, and this disregard for the law disqualifies him from Second Amendment rights."). In other words, the Defendants argue that Congress is empowered to cancel a fundamental right simply by passing a categorical ban without justification or support. Taken to its logical end, this approach would allow Congress to dictate that violation of any law—jaywalking, perhaps—causes a permanent lifetime ban on the possession of firearms, and would disallow courts from entertaining a constitutional challenge to that law brought by a jaywalker. This cannot be the case; the Second Amendment has "boundaries [that] are defined by the

---

[4] In fact, though the United States in its Motion to Dismiss argues that this Court can and should end its inquiry by finding that Kanter does not have Second Amendment rights (and therefore no means-ends scrutiny is required), the United States recently acknowledged in a brief to the Seventh Circuit that means-ends scrutiny *is* required under Seventh Circuit precedent. *See* Brief of Appellant, *Baer v. Lynch*, 636 F. App'x 695, Case No. 15-3040, 2015 WL 8166469, at \*9-10 (7th Cir. Dec. 4, 2015) ("Although other courts of appeals have treated the conclusion that an individual falls outside the scope of the Second Amendment's protections as sufficient to end the inquiry, this Court has further required the government to show that the ban is substantially related to an important governmental objective—*i.e.*, that it withstands intermediate scrutiny.").

Constitution. They are not defined by Congress." *United States v. Chovan*, 735 F.3d 1127, 1148 (9th Cir. 2013) (Bea, J., concurring).

To survive Kanter's challenge, the felon dispossession laws must survive intermediate scrutiny. As explained below, they cannot.

## II. The Felon Dispossession Laws at Issue Here, As Applied to Kanter, Cannot Pass Intermediate Scrutiny.

Unlike with a facial challenge, a plaintiff asserting an as-applied challenge does not contend that a law is unconstitutional as written but that its application to him under particular circumstances deprived him of a constitutional right. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) ("It is axiomatic that a 'statute may be invalid as applied to one state of facts and yet valid as applied to another.'") (citation omitted). Accordingly, Kanter's as-applied challenge requires the Court to consider whether his particular circumstances remove him from the constitutional sweep of 18 United States Code section 922(g)(1) and Wisconsin Statutes section 941.29(1m).

The Seventh Circuit uses a framework of intermediate scrutiny to determine whether a law burdening Second Amendment rights passes constitutional muster. *Williams*, 616 F.3d at 692; *see also United States v. Skoien*, 614 F.3d 638, 641–42 (7th Cir. 2010) ("The United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential [in reviewing a categorical limit on the possession of firearms] …. The concession is prudent ….").[5] To satisfy intermediate scrutiny, "the government has the burden of

---

[5] The Supreme Court has steered away from prescribing a particular level of scrutiny that courts should apply to categorical bans on the possession of firearms by specified groups of people, but it has said that rational-basis review would be too lenient. *See Heller*, 554 U.S. at 628 n. 27. The Seventh Circuit in *Williams* stopped short of holding that intermediate scrutiny is the precise test applicable to "all challenges to gun restrictions," 616 F.3d at 692, but because the *Williams* case involved a challenge to the same federal statute challenged here, Section 922(g)(1), the intermediate scrutiny test applied therein is appropriate here. Some other circuits approach as-applied Second Amendment challenges differently. *See Baer*, 636 F. App'x at 698 n.3 (contrasting the Seventh Circuit approach to that of the circuits which conclude that, "historically, felons were not protected by the Second

demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692.

The *Williams* court found the government's stated objective in that case, "to keep firearms out of the hands of violent felons, who the government believes are often those most likely to misuse firearms," was sufficiently important to pass intermediate scrutiny and that Section 922(g)(1) was substantially related to that objective, given that the government was able to point to the plaintiff's "violent past." *Williams*, 616 F.3d at 693. The plaintiff, Williams, had been convicted of felony robbery in Indiana, where robbery is violent by definition; his offense involved "beating the victim so badly that the victim required sixty-five stitches." *Id*.

But the Seventh Circuit went on to explain that Section 922(g)(1) "may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent…." *Id*. While the government was able to satisfy its burden in applying the felon dispossession law to Williams, as a violent felon who "is not the ideal candidate to challenge the constitutionality of § 922(g)(1)," the Court implied that, with the "ideal" (nonviolent) candidate, "the government may face a difficult burden of proving § 922(g)(1)'s" constitutionality. *Id*.

Kanter is the "ideal candidate" who the Seventh Circuit suggested would succeed in challenging felon dispossession laws as applied to him.

---

Amendment and, thus, a felon challenging the application of a restriction on gun possession must 'distinguish his circumstances' from those of the typical felon and show himself to be a law-abiding citizen entitled to Second Amendment protection." (citations omitted)). To the extent the Government Defendants imply that Kanter must satisfy the tests used by other circuits in Second Amendment challenges, their position in inconsistent with Seventh Circuit precedent.

**A.** **The Government Inconsistently Describes the Objective of Felon Dispossession Laws Because the Actual Objective, to Prevent Violent Crime, is not Applicable Here.**

Under the first prong of intermediate scrutiny, the government has the burden of demonstrating that the objective of the challenged law is an "important one." *Williams*, 616 F.3d at 692. Kanter does not contest that the governmental objectives of "combating serious crime and protecting public safety" (Lynch Br. at 1) and "preventing firearms violence" (Schimel Br. at 18) are important.

But it bears mention that the way the Defendants, in particular Defendant Lynch, describe the governmental objective of the felon dispossession laws in this case is slightly different than the way the United States has described the objective of the same laws in other, older cases; the United States has consistently argued that the objective of the laws is to keep firearms away from *violent felons* and prevent *violent* crime. *See, e.g., United States v. Meza-Rodriguez*, 798 F.3d 664, 673 (7th Cir. 2015) (Congress's objective in passing § 922(g) was "'to keep guns out of the hands of presumptively risky people'" and to "'suppress[ ] armed violence.'" (citation omitted)); *Williams*, 616 F.3d at 692–93 ("In this case, the government's stated objective is to keep firearms out of the hands of violent felons, who the government believes are often those most likely to misuse firearms."); *United States v. Yancey*, 621 F.3d 681, 684 (7th Cir. 2010) ("The broad objective of § 922(g)—suppressing armed violence—is without doubt an important one….").

The change in vernacular might be attributable to the United States' recognition that Kanter's offense was not a violent one, he has no history of violent conduct on his record, and there is no reason to suspect he will become violent in the future. For the reasons provided in the following section, depriving Kanter—a non-violent person with no violent criminal history—of

his right to own a firearm does not advance the Defendants' stated objectives of combating serious crime, protecting public safety, and preventing firearms violence.

**B.    The Felon Dispossession Laws at Issue Here are Not Substantially Related to the Governments' Stated Objectives as Applied to Kanter.**

Under the second prong of intermediate scrutiny, the government has the burden of demonstrating that its important objective "is advanced by means substantially related to that objective." *Williams*, 616 F.3d at 692.  The Government Defendants address this question at a high level of generality, because, in their view, crime is generally bad and criminals are generally untrustworthy.  But this element of scrutiny does not concern the government's generalized interest in disarming criminals; it concerns the relation (which must be substantial) between the government's objective of preventing violent crime and its disarming of *Rickey Kanter*, a non-violent person.  The Defendants cannot meet their burden with respect to Kanter.

Scholarship related to recidivism among white-collar offenders demonstrates that such offenders are significantly less likely than other, "common" criminals from committing future crimes at all, and of those white-collar offenders who do recidivate, a very small percentage of their future crimes involve violence.  *See* David Weisburd, Elin Waring, & Ellen F. Chayet, *White-Collar Crime and Criminal Careers* (2001).  The authors of *White-Collar Crime and Criminal Careers* undertook an extensive study based on a pool of white-collar offenders, data from which was collected by a group of Yale Law School researchers.  They examined eight federal crimes that fit, in their statutory descriptions, the broad definition of "white-collar" crime: antitrust offenses, securities fraud, mail and wire fraud, false claims and statements, credit and lending institution fraud, bank embezzlement, income tax fraud, and bribery. *Id.* at 12.  The sample provided "a unique opportunity for examining the social and criminal careers of a broad range of white-collar offenders."  *Id.* at 17.  The authors were able to, among other things,

examine the question of recidivism (including violent recidivism) "not through theory or speculation but through a close examination of the criminal histories of a sample of offenders convicted of white-collar crimes." *Id.* at 27.

Weisburd and his colleagues found that about half of the white-collar offenders in their data set were repeat offenders (meaning, in this study, that they had at least one other arrest on their record). *Id.* at 27. But very few of those offenders in the study with two arrests reported on their rap sheets were arrested for crimes involving violence—only 10.6%. *Id.* at 45, Table 2.9. And of all repeat offenders (including those with more than two arrests on their rap sheets), slightly less than a quarter had a violent arrest on their record:

Table 2.9. *Prevalence of broad crime types, by total number of arrests, for repeat offenders*

| Total number of arrests | Types of additional arrests | | | | | |
| | At least one white-collar arrest (%) | At least one drug arrest (%) | At least one violent arrest (%) | At least one other arrest (%) | Only white-collar arrests (%) | Base *n* |
|---|---|---|---|---|---|---|
| Two | 33.8 | 4.6 | 10.6 | 49.7 | 33.8 | 151 |
| Three to five | 50.0 | 9.4 | 21.9 | 81.2 | 10.0 | 160 |
| Six to ten | 71.0 | 29.0 | 33.3 | 91.4 | 3.2 | 93 |
| Eleven or more | 75.4 | 47.5 | 52.5 | 98.4 | 0.0 | 61 |
| All repeat offenders | 52.3 | 16.8 | 24.5 | 75.3 | 15.1 | 465 |

*Id.* at 45.

To put it more simply, according to Weisburd's study, only about half of white-collar offenders will be arrested for any type of subsequent offense, and less than a quarter of *those* offenders will be arrested for a violent offense.

A much better indicator of future violent criminal activity among white-collar offenders

is the frequency of offending. *Id.* at 46. Weisburd's "data suggest an important link between frequency of offending and crime seriousness. As illustrated in Table 2.9 [above], the offenders with the highest number of arrests were also most likely to have had arrests for the most serious crimes. In contrast, those with fewer arrests seldom had violent crimes in their criminal histories." *Id.* As indicated earlier, Kanter has only one criminal conviction on his record.

This conclusion squares with a 2004 study conducted by the United States Sentencing Commission as part of its Fifteen Year Report on its Legislative Mandate. *See* U.S. Sentencing Commission, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (May 2004). That study found that offenders sentenced under fraud statutes were overall the least likely to recidivate. *Id.* at 13. Further, those offenders sentenced for fraud who had an otherwise sparse criminal history (Category I of the Criminal History Categories) were the least likely of any criminal to recidivate. *Id.* at 30, Exhibit 11.

These statistics reveal the ways in which the felon dispossession laws are both under- and over-inclusive. The laws are over-inclusive in that they disarm felons who are not statistically likely to engage in violent misuse of firearms in the future; they are under-inclusive in that they do *not* disarm some "common" criminals (misdemeanants) and repeat offenders whose offenses are violent and who are statistically more likely to engage in violent misuse of firearms in the future. *See, e.g,* Wis. Stat. § 940.19(1) (it a misdemeanor to "cause[] bodily harm to another by an act done with intent to cause bodily harm to that person or another without the consent of the person so harmed …" and therefore conviction under this statute does not trigger the felon dispossession laws). While intermediate scrutiny does not require a perfect means-ends fit, the substantial over- *and* under-inclusiveness of the felon dispossession laws cause them to fail intermediate scrutiny here. *See Clarkson v. Town of Florence*, 198 F. Supp. 2d 997, 1009 (E.D.

Wis. 2002) ("Intermediate scrutiny does not require the government to employ the least restrictive means to achieve its goal, but it *also* does not permit the government to escape *any* obligation to narrowly tailor its regulation. Wherever the law mandates strict or intermediate scrutiny, a requirement of regulatory precision is involved; a substantial congruence must exist between the regulatory means ... and valid legislative ends.") (internal citations and quotations omitted). To be sure, the government could adopt dispossession laws that are less burdensome on fundamental rights *and* more efficacious by disarming only violent and repeat offenders (those being the categories of offenders most likely to commit violent acts in the future). And because the government could adopt a narrower (and, here, likely more effective) regulation that advances its objectives, it cannot constitutionally enforce those at issue here. *See id.* ("Thus, the requirement of narrow tailoring means that when the government could adopt a narrower regulation that would significantly reduce the negative impact on [constitutionally protected conduct] without substantially interfering with its legislative goals it must do so.").

The statistics the Defendants cite, in an attempt to justify the governments' disarmament of all felons, are mostly irrelevant to offenders like Kanter, who was convicted of mail fraud based on non-violent and relatively innocuous facts. For example, Lynch and Schimel both cite to the Bureau of Justice Special Report, Matthew R. Durose, Alexia D. Cooper, & Howard N. Snyder, Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010 (Apr. 2014) ("Bureau of Justice Special Report") for its statistic of rearrests of "property crime offenders" for future violent offenses (28.5%). (Lynch Br. at 13–14; Schimel Br. at 21 n.6.) But that Report defines "property crimes" to include much more than the type of fraud for which Kanter was convicted; it includes burglary, arson, stolen property offenses, possession of burglary tools, and damage to property. *See* Bureau of Justice Special Report at 22. Such a

statistic is not relevant in evaluating whether Kanter is likely to commit a violent offense in the future.

Apart from citing few and largely inapplicable statistics, the Defendants ask the Court to take their word for it that felons (even those whose offenses were non-violent and who have no history of violence) are likely to commit violent crime in the future because other courts have said so. (*See, e.g.,* Schimel Br. at 20 (citing *Yancey,* 621 F.3d at 685).[6]) But the other courts' decisions to which the Defendants cite are also not supported by persuasive evidence that nonviolent felons are likely to misuse firearms in the future. For example, though the Seventh Circuit in *Moore v. Madigan* stated that felons (making no distinction between violent and non-violent felons) are members of class of people who are "obviously dangerous," it cited for support of that proposition only the *Heller* Court's statement that felon dispossession laws are presumptively valid. 702 F.3d 933, 940 (7th Cir. 2012) (citing *Heller,* 554 U.S. at 626). Of course, the Seventh Circuit has also interpreted *Heller* to mean that a *nonviolent* felon could challenge the law as applied to him and "the government may face a difficult burden of proving § 922(g)(1)'s" constitutionality. *Williams*, 616 F.3d at 693.

The Third Circuit recently considered the very question presented here—whether felon dispossession laws are constitutional as applied to non-violent offenders[7]—and, presented with statistics similar to those the Government Defendants cite here, found the government in that

---

[6] Though the *Yancey* Court stated that "[w]e have already concluded that barring felons from firearm possession is constitutional," *Yancey,* 621 F.3d at 684, it cited *Williams,* 616 F.3d at 693-94, for that proposition, and the *Williams* Court specifically left open the question of whether a *nonviolent* felon could succeed in challenging felon dispossession laws as applied to him.

[7] The consolidated appeal involved two men, one of whom had been convicted in Pennsylvania of a misdemeanor for sex with a minor and the other of whom was convicted in Maryland of a misdemeanor for carrying a handgun without license. Though both convictions were misdemeanors under state law, they fell within the federal felon dispossession statute because they are punishable by a term of imprisonment of more than two years. *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 340-42 (3d Cir. 2016).

case fell "well short of satisfying its burden … under intermediate scrutiny." *Binderup v. Attorney Gen. United States of Am.*, 836 F.3d 336, 353 (3d Cir. 2016). In addition to its "off-point statistical studies," the government defendant in *Binderup* relied on bald assertions about criminals belonging to "a category of 'potentially irresponsible persons,' … [who are] 'particularly likely to commit additional crimes in the future.'" *Id.* at 354. But bald assertions are not enough, the Third Circuit held: The government "must 'present some meaningful evidence, not mere assertions, to justify its predictive [and here conclusory] judgments.'" *Id.* (citing *Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011)). The *Binderup* court affirmed the decisions of the two lower courts finding the federal felon dispossession law unconstitutional as applied to the defendants. *Id.* at 357.

Judge Posner's reasoning in *United States v. Lane*, a case that predates the *Heller* Court's ruling that the Second Amendment bestows a fundamental right to individual gun ownership, demonstrates how the logic used to support felon dispossession laws *generally* does not support felon dispossession laws *as applied to nonviolent felons*. 252 F.3d 905 (7th Cir. 2001). Judge Posner wrote in *Lane* that:

> A person who has been convicted of committing a felony (and not been pardoned) is no doubt more likely to make an illegal use of a firearm than a nonfelon, and the illegal use is likely to involve violence. Otherwise it would be a little difficult to see why being a felon in possession of a firearm is a crime. But is the risk *substantial? And for all felonies other than those (just antitrust and related offenses) excepted from the reach of section 922(g)(1) by section 921(a)(20)(A)? We are pointed to no evidence that it is. Most felonies after all are not violent … and ex-felons have the same motives as lawful possessors of firearms to possess a firearm—self-defense, hunting, gun collecting, and target practice.*

*Id.* at 906 (italics in original, underline added).

Intermediate scrutiny requires that the Defendants prove a *substantial* relationship between the felon dispossession laws applied to Kanter and their stated objective of ensuring

public safety and preventing violent crime.  As Poser prophetically noted in *Lane*, non-violent felons have the same motives as lawful possessors of firearms; precluding them from owning a gun does not advance, especially substantially, the government's important goal of protecting the public's safety.  The felon dispossession laws are therefore unconstitutional as applied to Kanter, an indisputably nonviolent felon.

### CONCLUSION

Kanter's nonviolent felony conviction should not qualify him for a federal or state lifetime firearms prohibition.  For the reasons stated herein, he respectfully requests that this Court deny the Defendants' Motions to Dismiss and for Judgment on the Pleadings, and grant his Motion for Summary Judgment.

Dated this 2nd day of December, 2016.

s/Mark A. Cameli
Mark A. Cameli
WI State Bar ID No. 1012040
mcameli@reinhartlaw.com
Kate E. Maternowski
WI State Bar ID No. 1091126
kmaternowski@reinhartlaw.com
Attorneys for Rickey I. Kanter
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202

Mailing Address:
P.O. Box 2965
Milwaukee, WI 53201-2965
Telephone:  414-298-1000
Facsimile:  414-298-8097

35233926