IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

RICKEY I. KANTER,

        Plaintiff,

      v.                            Case No. 16CV1121

LORETTA ELIZABETH LYNCH,

and

BRAD D. SCHIMEL,

        Defendants.

**REPLY BRIEF IN SUPPORT OF WISCONSIN ATTORNEY GENERAL BRAD SCHIMEL'S MOTION FOR JUDGMENT ON THE PLEADINGS AND IN OPPOSTION TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Rickey Kanter's response brief fails to show that the Second Amendment forbids Wisconsin from disarming convicted felons who pose an elevated risk of firearms violence.

First, Kanter does not explain why, despite his serious felony conviction for mail fraud, Wisconsin's "presumptively lawful" possession ban cannot disarm him, consistent with the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 626 & n.26 (2008). Instead, Kanter cites Seventh Circuit cases that have left open whether some felons may rebut that presumption. Ample authority supports holding that, consistent with *Heller*, Kanter's

decision to commit a serious felony disqualifies him from Second Amendment rights.

Second, Kanter's own arguments demonstrate that disarming non-violent felons survives heightened constitutional scrutiny. The statistics Kanter offers show that white-collar criminals like him have a significant arrest rate for violent crime, one much higher than the general population. This alone shows that disarming felons like Kanter substantially relates to "keeping those most likely to misuse firearms from obtaining them" and thus complies with the Second Amendment. *Baer v. Lynch*, 636 F. App'x 695, 698 (7th Cir. 2016). Kanter mainly argues that Wisconsin's possession ban is overbroad, but the Seventh Circuit gives legislatures substantial leeway when deciding how best to disarm groups that pose a heightened risk of violent crime and firearms misuse. Wisconsin Stat. § 941.29 should be upheld, accordingly.

## ARGUMENT

### I. Kanter fails to show that, as a convicted felon, he enjoys Second Amendment rights.

Kanter largely ignores the substantial case law and historical precedent showing that Wisconsin's possession ban passes constitutional muster due to his lack of Second Amendment rights. While Kanter emphasizes *Heller*'s holding that the Second Amendment protects an individual's right to bear

arms, he fails to show that he "is not disqualified from the exercise of Second Amendment rights." 554 U.S. at 635. (Pl.'s Br. ISO Mot. for Summ. J. 8[1] (Dkt. 28) ("Pl.'s Br.").) Kanter's decision to commit a serious felony shows why Wisconsin's "presumptively lawful" possession ban can disarm him, without engaging in further scrutiny. 554 U.S. at 627 n.26. (Wis. Def.'s Br. ISO Mot. for J. on the Pleadings 15–20 (Dkt. 26) ("Wis. Def.'s Br.").)

Rather than explain why he nevertheless is qualified to exercise Second Amendment rights, Kanter overstates the Seventh Circuit's holdings in *United States v. Williams* and *Baer v. Lynch.* Kanter contends that these cases require this Court to short-circuit the Second Amendment analysis and examine only whether Wisconsin's restriction passes intermediate scrutiny. (Pl.'s Br. 8–11.) But neither case altered the Seventh Circuit's two-step test for analyzing Second Amendment claims: first, whether the restricted conduct falls within the Second Amendment's scope; and second, if so, whether the restriction survives heightened scrutiny. *See Ezell v. City of Chi.*, 651 F.3d 684, 701–03 (7th Cir. 2011); *United States v. Williams*, 616 F.3d 685, 691 (7th Cir. 2010); *Baer*, 636 F. App'x at 698. Indeed, even *Williams* acknowledged that, under *Heller*, "the threshold inquiry is whether [the

---

[1] Throughout, pincites to briefs reference the briefs' internal pagination rather than the ECF pagination.

plaintiff] is qualified to possess a firearm in the first instance." 616 F.3d at 692.

Moreover, neither *Williams* nor *Baer* held that felons like Kanter *do* enjoy Second Amendment protections. Instead, as the court noted in *Baer*, "[w]e have not decided if felons historically were outside the scope of the Second Amendment's protection." 636 F. App'x at 698; *see also Williams*, 616 F.3d at 692 ("[W]e need not address whether convicted felons fell outside the scope of the Second Amendment's protections . . . ."). Those cases thus upheld possession bans by skipping to step two of the analysis, finding that the bans survived heightened scrutiny. Ample authority supports resolving step one consistent with *Heller* and finding that Kanter's serious felony places him outside the Second Amendment's scope. (Wis. Def.'s Br. 8–14.)

None of the other cases Kanter cites held that felons like him enjoy Second Amendment protections. (Pl.'s Br. 10–11.) To the contrary, *United States v. Moore* held that a felon "simply does not fall within the category of citizens to which the *Heller* court ascribed the Second Amendment protection of 'the right of law-abiding responsible citizens to use arms in defense of hearth and home.'" 666 F.3d 313, 319 (4th Cir. 2012) (quoting *Heller*, 554 U.S. at 635). As for *United States v. Torres-Rosario*, Kanter cites only dicta speculating about whether the Supreme Court "may be open" to some felons' hypothetical claims; the case summarily upheld a possession ban

applied to drug offenders without applying heightened scrutiny. 658 F.3d 110, 113 (1st Cir. 2011). *United States v. Schrader* also upheld a possession ban. 704 F.3d 980, 989–90 (D.C. Cir. 2013). Although that case did apply intermediate scrutiny, it did not resolve whether felons like Kanter enjoy Second Amendment rights. *Id.* And *Tyler v. Hillsdale County Sheriff's Department* is inapposite because it concerned disarming the mentally ill, not felons. 837 F.3d 678, 690 (6th Cir. 2016).

Kanter also wrongly argues that excluding felons from the Second Amendment's scope is somehow "circular" and "self-constitutionalizing." (Pl.'s Br. 11.) *Heller* does not suggest that a legislature can capriciously exclude from the Second Amendment any group of citizens that it likes—and that is not what Wisconsin's possession ban does. Instead, Wisconsin only disarms those who have committed a crime serious enough that either Wisconsin's Legislature or Congress has deemed it a felony. This approach is entirely consistent with *Heller*'s express refusal to "cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626.

Rather than address his serious mail fraud felony (*see* Wis. Def.'s Br. 15–18), Kanter asserts that, hypothetically, disarming jaywalkers might be unconstitutional. (Pl.'s Br. 11.) But jaywalking is not a felony in Wisconsin. *See* Wis. Stat. §§ 346.25, 346.30. Although some legislative judgment does

inhere in classifying crimes as felonies, Kanter offers no reason to suspect that either Wisconsin's Legislature or Congress has drawn those lines in a way that *Heller* and the Second Amendment do not allow.

In any event, Kanter was not convicted of jaywalking, and he cannot "obtain relief based on arguments that a differently situated person might present." *United States v. Skoien*, 614 F.3d 638, 645 (7th Cir. 2010). Perhaps Wis. Stat. § 941.29 "may be subject to an overbreadth challenge at some point," but Kanter "is not the ideal candidate" for such a challenge due to the serious felony he committed. *Williams*, 616 F.3d at 693.

## II. Kanter fails to rebut the showing that disarming non-violent felons is substantially related to reducing firearms violence.

Even if Kanter enjoys Second Amendment protections, he does not rebut the showing that Wisconsin's possession ban substantially relates to its "interest in keeping those most likely to misuse firearms from obtaining them." *Baer*, 636 F. App'x at 698. Most importantly, Kanter offers evidence showing that white-collar criminals like him are much more likely to be arrested for violent crime than the general population. This establishes the substantial relationship that the Second Amendment requires to justify disarming convicted felons like Kanter. Kanter's main critique—that the possession ban applies too broadly—fails under Seventh Circuit precedent, which allows some overbreadth when legislatures make reasonable, difficult judgments about how best to lower the risk of deadly firearms violence.

### A. Kanter shows that disarming convicted felons like him will reduce the risk of firearms violence.

Kanter's own argument demonstrates why Wisconsin's possession ban survives heightened constitutional scrutiny: his statistics show that criminals like him are significantly more likely to be arrested for a violent crime than the general population. That alone defeats his claim, under intermediate scrutiny.

Kanter agrees, as he must, that this Court evaluates Wisconsin's ban using intermediate scrutiny, not strict scrutiny. (Pl.'s Br. 12–13.) He agrees that reducing firearms violence—the goal of Wisconsin's ban—is sufficiently important under intermediate scrutiny. (Pl.'s Br. 14.) And he agrees that "intermediate scrutiny does not require a perfect means-ends fit." (Pl.'s Br. 17.)

Applied here, the very study that Kanter cites establishes the means-ends fit that intermediate scrutiny requires. It shows that around *one out of eight* (or 12.5%) of all white-collar criminals will be arrested for a violent crime. (Pl.'s Br. 16.[2]) Other statistics he cites show that around one out of six

---

[2] Kanter notes that half of all white collar criminals will have other arrests, and a quarter of those arrests will be for a violent crime. This equates to one out of eight.

(or around 17%) of all fraud convicts will recidivate. (Pl.'s Br. 17.[3]) These rates contrast sharply with the violent crime arrest rate for the general population, which in 2015 was only around 0.15%.[4] The 12.5% violent crime arrest rate for white-collar criminals is about *83 times higher* than the 0.15% arrest rate for the general population. Of course, the presence of firearms would only escalate the risks posed by those violent crimes.[5]

Yet Kanter contends that Wisconsin's Legislature cannot constitutionally disarm a group 83 times more likely to be arrested for violent crime than the general population. That cannot be the right answer. If preventing such a group from possessing firearms is not "substantially

---

[3] *See* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 30 (May 2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last accessed January 9, 2017). This figure includes both violent and non-violent crimes, but the same study found that over ten percent of all convicts' re-arrest crimes involved violence. *See id.* at 32.

[4] The Federal Bureau of Investigation found a violent crime arrest rate of 157.2 per 100,000 inhabitants, or around 0.15%. Press Release, FBI, "*FBI Releases 2015 Crime Statistics*" (Sept. 26, 2016), https://www.fbi.gov/news/pressrel/press-releases/fbi-releases-2015-crime-statistics (last accessed January 9, 2017).

[5] Around ten percent of all violent crimes involve firearms, as do 70% of all homicides. U.S. Dep't of Justice, *National Crime Victimization Survey, 1993-2001: Weapon Use and Violent Crime*, 2 (Sept. 2003), http://www.bjs.gov/content/pub/pdf/wuvc01.pdf (last accessed January 9, 2017).

8

related" to the goal of reducing firearms violence, it is difficult to imagine what would be. *Williams*, 616 F.3d at 692.

Unsurprisingly, the Seventh Circuit does not require Kanter's unreasonable result. In *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010) and *Skoien*, 614 F.3d 638, the Seventh Circuit upheld disarming domestic violence misdemeanants and drug users given evidence similar to what Kanter offers. In *Yancey*, the court confirmed that drug users can be disarmed given evidence of the "connection between chronic drug abuse and violent crime"—including evidence that "drug abusers are more likely to engage in both property and violent crimes." 621 F.3d at 686. Likewise, in *Skoien*, the court relied in part on a misdemeanor domestic violence re-arrest rate of 17% (while noting that "[t]he full recidivism rate includes violence that does not lead to an arrest"). 614 F.3d at 644. The statistics that Kanter cites are not materially different. They also suffice to justify Wisconsin's possession ban.

In sum, Kanter himself demonstrates a connection—indeed, a substantial relationship—between convicts who commit crimes like his and future violent crime. As the Seventh Circuit has recognized, this suffices under the Second Amendment to justify disarming those dangerous groups. Wisconsin's possession ban should be upheld.

**B.** **Intermediate scrutiny does not require the precise tailoring that Kanter advocates, especially when considering firearm possession bans.**

Despite his concession that a connection exists between white-collar criminals and violent crime, Kanter responds that Wisconsin's possession ban still fails intermediate scrutiny because it is "over-inclusive." (Pl.'s Br. 17–18.) He claims that felons like him are "not statistically likely to engage in violent misuse of firearms in the future," but that frames the issue too narrowly. (Pl.'s Br. 17.) Neither *Yancey* nor *Skoien* required specific evidence that drug users and domestic violence misdemeanants would misuse firearms—those cases simply credited evidence of a connection between the misconduct and violent crime. 621 F.3d at 686; 614 F.3d at 644. Disarming people more likely to commit violent crimes obviously reduces the risk of firearms violence. *See supra* note 4.

The evidence here establishes the same link as in *Yancey* and *Skoien*. Again, relative to the general population, white-collar criminals are about 83 times more likely to be arrested for a violent crime. And their absolute recidivism rate of around 12.5% is not materially different from rates the Seventh Circuit considered in *Yancey* and *Skoien*. Neither case required evidence that nearly all, or even *most*, drug users or domestic violence misdemeanants would commit future violent crimes. *See Yancey*, 621 F.3d at 686; *Skoien*, 614 F.3d at 644. The Seventh Circuit thus recognized that

legislatures may disarm an entire group even if some members would not commit a violent crime, given the uncertainties inherent in such predictions. Other courts of appeals agree that, in the context of possession bans, "[t]he regulation need not be the least restrictive means of serving the interest . . . ." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010).[6]

Kanter responds that he should be excused from Wisconsin's ban because he committed only one felony and violent crime increasingly occurs as a criminal's number of arrests increases. (Pl.'s Br. 16–17.) But legislatures deserve substantial deference when predicting which groups pose a heightened risk of firearms violence. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 665 (1994); *Schrader*, 704 F.3d at 990. Kanter's response thus improperly relies on 20/20 hindsight. Around half of white-collar criminals like Kanter will be arrested for least one more crime. (Pl.'s Br. 16.) But, before the fact, Wisconsin cannot know whether a particular criminal will be arrested for one, two, or maybe ten more crimes. All it can know is that white-collar criminals are much more likely to be arrested for a violent crime than the general population. Waiting to disarm felons until *after* they commit

---

[6] The "narrow tailoring" analysis in the *Clarkson v. Town of Florence* case that Kanter cites does not apply here. 198 F. Supp. 2d 997, 1009 (E.D. Wis. 2002). (Pl.'s Br. 17–18.) That case applied a First Amendment test the Supreme Court had specifically developed for "content-based restriction[s] directed at adult entertainment" that required narrow tailoring. *See Clarkson*, 198 F. Supp. 2d at 1009 (citing *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986)).

more crimes—each one possibly violent—is like closing the barn door after the cows have escaped.

Kanter also calls the recidivism evidence Wisconsin offered "mostly irrelevant" because it is supposedly too broad. (Pl.'s Br. 18–19; Wis. Def.'s Br. 20–21.) To the extent Kanter demands recidivism rates for people convicted once of mail fraud under 18 U.S.C. § 1341, that would effectively amount to the "case-by-case" evidence that the Seventh Circuit has refused to require. *See Skoien*, 614 F.3d at 641; *Baer*, 636 F. App'x at 697 n.1. Kanter seems to concede this point by citing statistics about white-collar criminals—a citation which assumes that recidivism rates for a specific group can justify (or preclude) disarming members of that group. (Pl.'s Br. 15–17.)

No dispute exists that Kanter belongs to both groups for which Wisconsin identified significant recidivism rates: non-violent offenders, generally, and property crime offenders, specifically. (Wis. Def.'s Br. 21 n.6.) Of course, both groups include criminals incarcerated for crimes other than Kanter's, but the Seventh Circuit has not examined crime-by-crime statistics when disarming violent felons, whose recidivism rates also vary by specific types of violent crime.[7] In any event, more specific statistics recently became

---

[7] *See* Matthew R. Durose, Alexia D. Cooper, and Howard N. Snyder, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010, Supplemental Tables*, Bureau of Justice Statistics Special Report, tbl. 2 (Dec. 2016),

available: Around *one out of five* incarcerated fraud convicts are rearrested for a violent crime within five years of their release.[8] However one slices the numbers, a significant number of people like Kanter will commit a violent crime. That suffices under the Second Amendment to disarm them.

Kanter only underscores why the evidence here suffices by citing *Binderup v. Attorney General United States*, 836 F.3d 336 (3rd Cir. 2016) (en banc). (Pl.'s Br. 19–20.) There, incarcerated felons' recidivism rates could not justify disarming the plaintiffs, since they were merely "state-law misdemeanants who spent no time in jail." *Id.* at 354. Here, by contrast, Kanter *was* an incarcerated felon. The substantial violent crime rate in that group (and more specific groups to which Kanter belongs) is exactly the meaningful evidence that the court found lacking in *Binderup*.

As for Kanter's citation to *United States v. Lane*, that case considered an unrelated issue: whether violating the federal possession ban was itself a "crime of violence" under 18 U.S.C. § 3156(a)(4)(B), such that a convict must remain in custody during an appeal. 252 F.3d 905, 906 (7th Cir. 2001). (Pl.'s Br. 20–21.) That statute defined a "crime of violence," in part, as "a felony . . . that, by its nature, involves a substantial risk that physical force

---

https://www.bjs.gov/content/pub/pdf/rprts05p0510_st.pdf (last accessed January 9, 2017).

[8] *Id.*

against the person or property of another may be used *in the course of committing the offense.*" 18 U.S.C. § 3156(a)(4)(B). Judge Posner distinguished this definition from the relevant forward-looking analysis here, explaining that "[a] crime that increases the likelihood of a crime of violence need not itself be a crime of violence." *Lane*, 252 F.3d at 907. Non-violent felonies like Kanter's increase the likelihood of a crime of violence and thus justify disarmament under the Second Amendment, even though they are not themselves "crimes of violence" under 18 U.S.C. § 3156(a)(4)(B).

Moreover, nothing indicates that the court in *Lane* considered the specific statistics offered here, none of which are generic to all felons. Those statistics show that criminals like Kanter—incarcerated non-violent felons, generally, and offenders who committed property, fraud, and white-collar crimes, specifically—pose a substantial risk of future violent crime. (*See supra* Section II.A; Wis. Def.'s Br. 20–21.) This evidence is what matters to the Second Amendment analysis, not the possibility that Kanter may want to own firearms for lawful reasons, as he asserts. (Pl.'s Br. 20–21.) Violent felons may have the same lawful motivations as non-violent ones, but the Second Amendment still allows Wisconsin to disarm members of both groups due to the heightened risk they pose to public safety.

## CONCLUSION

For the foregoing reasons, the Wisconsin Attorney General respectfully requests that this Court grant his motion for judgment on the pleadings and deny Kanter's motion for summary judgment.

Dated this 9th day of January, 2017.

Respectfully submitted,

BRAD D. SCHIMEL
Wisconsin Attorney General

/s/Colin T. Roth
COLIN T. ROTH
Assistant Attorney General
State Bar #1103985

BRIAN P. KEENAN
Assistant Attorney General
State Bar #1056525

Attorneys for Defendant Brad D. Schimel

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219 (Roth)
(608) 266-0020 (Keenan)
(608) 267-2223 (Fax)
rothct@doj.state.wi.us
keenanbp@doj.state.wi.us

15