CERTIFIED COPY

A True Copy

Teste:

_____

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 18-1478

RICKEY I. KANTER,

*Plaintiff-Appellant,*

*v.*

WILLIAM P. BARR, Attorney General
of the United States, *et al.,*

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 16-cv-1121 — **William C. Griesbach**, *Chief Judge.*

_____

ARGUED SEPTEMBER 7, 2018 — DECIDED MARCH 15, 2019

_____

Before FLAUM, RIPPLE, and BARRETT, *Circuit Judges.*

FLAUM, *Circuit Judge.* Rickey I. Kanter pleaded guilty to one count of mail fraud under 18 U.S.C. § 1341. Due to his felony conviction, he is prohibited from possessing a firearm under both federal and Wisconsin law. At issue in this case is whether the felon dispossession statutes—18 U.S.C. § 922(g)(1) and Wis. Stat. § 941.29(1m)—violate the Second Amendment as applied to Kanter. Even if Kanter could bring

an as-applied challenge, the government has met its burden of establishing that the felon dispossession statutes are substantially related to an important government interest. We therefore affirm the district court.

## I. Background

### A. Federal and Wisconsin Felon Dispossession Statutes

Section 922(g)(1) prohibits firearm possession by persons convicted of "a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). State misdemeanors are included under the statute if they are punishable by more than two years in prison.[1] *Id.* § 921(a)(20)(B). However, the statute excludes anyone convicted of "any Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." *Id.* § 921(a)(20)(A). Moreover, "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored" is not a conviction for purposes of the statute. *Id.* § 921(a)(20).

Although the firearms prohibition generally applies for life, the statute includes a "safety valve" that permits individuals to apply to the Attorney General for restoration of their firearms rights. *Logan v. United States*, 552 U.S. 23, 28 n.1

---

[1] Accordingly, calling the statute a "felon" dispossession statute is somewhat of a "misnomer." Carly Lagrotteria, Note, *Heller's Collateral Damage: As-Applied Challenges to the Felon-in-Possession Prohibition*, 86 Fordham L. Rev. 1963, 1970 (2018).

(2007). Specifically, the Attorney General[2] may remove the prohibition on a case-by-case basis if an applicant sufficiently establishes "that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c).

Since 1992, however, "Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications,'" rendering the provision "inoperative." *Logan*, 552 U.S. at 28 n.1 (quoting *United States v. Bean*, 537 U.S. 71, 74–75 (2002)). The Committee on Appropriations eliminated funding because the restoration procedure under § 925(c) was "a very difficult task" that required ATF officials to "spend many hours investigating a particular applicant for relief." H.R. Rep. No. 102-618, at 14 (1992). Even then, there was "no way to know with any certainty whether the applicant [was] still a danger to public safety." *Id.* Accordingly, ATF officials were effectively "required to guess whether a convicted felon … [could] be entrusted with a firearm." *Id.* Moreover, they were "forced to make these decisions knowing that a mistake could have devastating consequences for innocent citizens." *Id.* Ultimately, the Committee determined that "the $3.75 million and the 40 man-years annually spent investigating and acting upon these applications for relief would be better utilized by ATF in fighting violent crime." *Id.* The Committee addressed the funding issue again in 1995, adding that "too many of these

---

[2] The Attorney General delegated its authority under § 925(c) to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). 28 C.F.R. § 0.130(a)(1).

felons whose gun ownership rights were restored went on to commit violent crimes with firearms." H.R. Rep. No. 104-183, at 15 (1995).

In 1981, Wisconsin adopted its own felon dispossession law. *See* Wis. Stat. § 941.29(1m). Section 941.29(1m) prohibits an individual from possessing a firearm if he has "been convicted of a felony in" Wisconsin or "a crime elsewhere that would be a felony" in Wisconsin. *Id.* § 941.29(1m)(a)–(b).

## B. Factual Background

Kanter lives in Mequon, Wisconsin. He was previously the owner, operator, and CEO of Rikco International, LLC. Rikco International, which did business as "Dr. Comfort," manufactured therapeutic shoes and inserts for individuals with diabetes and severe foot disease. The company marketed the shoes and inserts to podiatrists, who in turn sold them to individual consumers. Most of the shoes and inserts were billed to, and paid for by, Medicare. Medicare only paid for inserts that met certain thickness and hardness standards.

In April 2004, Kanter submitted his inserts to Medicare to determine whether they met those requirements. Medicare rejected Kanter's inserts because they were too thin. Kanter then submitted revised samples, which Medicare approved. However, Kanter continued to sell the noncompliant inserts while representing that they were Medicare-approved. All told, Medicare paid Kanter's company $375,000 for the noncompliant inserts.

On May 24, 2011, Kanter pleaded guilty to one count of mail fraud under 18 U.S.C. § 1341 based on a shipment of the noncompliant inserts to a podiatrist in Florida. Section 1341 carries a maximum penalty of twenty years in prison and a

$250,000 fine. Kanter was sentenced to one year and one day in prison and two years of supervised release. He was also ordered to pay a criminal penalty of $50,000, and he reimbursed Medicare over $27 million in a related civil settlement.

Kanter has since served his time and paid his criminal penalty, and he has not been charged with any additional criminal activity. However, because of his felony conviction, he is permanently prohibited from owning a firearm under federal and Wisconsin law.

## C.  Procedural Background

Kanter brought suit in the Eastern District of Wisconsin, arguing that 18 U.S.C. § 922(g)(1) and Wis. Stat. § 941.29(1m) are unconstitutional under the Second Amendment as applied to him. The United States moved to dismiss his claim under Rule 12(b)(6), and Wisconsin moved for judgment on the pleadings under Rule 12(c). In response, Kanter moved for summary judgment, arguing that his status as a nonviolent offender with no other criminal record meant that both statutes were unconstitutional as applied to him.

The district court granted defendants' motions and denied Kanter's motion. In so doing, the district court held that, even assuming felons are entitled to Second Amendment protection, the application of the federal and Wisconsin felon dispossession laws to Kanter is substantially related to the government's important interest in preventing gun violence. The court reasoned that Congress and the Wisconsin legislature are entitled to categorically disqualify all felons—even nonviolent felons like Kanter—because both have found that such individuals are more likely to abuse firearms. The court also noted that this "bright line categorical approach ... allows for

uniform application and ease of administration." The district court entered judgment on January 2, 2018, and this appeal followed.

## II. Discussion

We review de novo a district court's ruling on a motion to dismiss for failure to state a claim and a motion for judgment on the pleadings. *Landmark Am. Ins. Co. v. Hilger*, 838 F.3d 821, 824 (7th Cir. 2016). In doing so, "we accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). To avoid dismissal, "the complaint must 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### A. Legal Standard[3]

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court identified the "core" of the Second Amendment as "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 634–35. Accordingly, the Court concluded that Washington D.C.'s ban on handgun possession in the home violated the Second Amendment. *Id.* at 635.

However, the Court also made clear that "the right secured by the Second Amendment is not unlimited." *Id.* at 626.

---

[3] Because "the federal and state prohibitions are equivalent in effect" as to Kanter, our Second Amendment analysis of the two statutes is the same. *Baer v. Lynch*, 636 F. App'x 695, 698–99 (7th Cir. 2016).

Although the Court did not "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment," it said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* It described such prohibitions as "presumptively lawful regulatory measures." *Id.* at 627 n.26. Two years later, in *McDonald v. City of Chicago*, the Court "repeat[ed] [its] assurances" that felon dispossession laws remain valid. 561 U.S. 742, 786 (2010) (plurality opinion).

After *Heller*, we developed a two-step test for Second Amendment challenges. "The threshold question is whether the regulated activity falls within the scope of the Second Amendment." *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) ("*Ezell II*"). "This is a textual and historical inquiry; if the government can establish that the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'" *Id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011) ("*Ezell I*")).

However, "if the historical evidence is inconclusive or suggests that the regulated activity is *not* categorically unprotected[,] then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (quoting *Ezell I*, 651 F.3d at 703). At step two, we evaluate "the regulatory means the government has chosen and the public-benefits end it seeks to achieve." *Id.* (quoting *Ezell I*, 651 F.3d at 703). The rigor of the review is dependent on "how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." *Id.* (quoting *Ezell I*,

651 F.3d at 703). "Severe burdens" on this core right "require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified." *Id.* The government has the burden "of justifying its law under a heightened standard of scrutiny; rational-basis review does not apply." *Id.* We have consistently described step two as "akin to intermediate scrutiny" and have required the government to show that the challenged statute is substantially related to an important governmental objective. *United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) (citing cases).

## B. As-Applied Second Amendment Challenges

Relying on the "presumptively lawful" language in *Heller* and *McDonald*, every federal court of appeals to address the issue has held that § 922(g)(1) does not violate the Second Amendment on its face. *See, e.g.*, *United States v. Davis*, 406 F. App'x 52, 53–54 (7th Cir. 2010); *United States v. Bogle*, 717 F.3d 281, 281–82 (2d Cir. 2013) (per curiam); *United States v. Moore*, 666 F.3d 313, 318–19 (4th Cir. 2012); *United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011), *overruled on other grounds by Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc); *Schrader v. Holder*, 704 F.3d 980, 989–91 (D.C. Cir. 2013), *cert. denied*, 571 U.S. 989 (2013); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Khami*, 362 F. App'x 501, 508 (6th Cir. 2010), *cert. denied*, 560 U.S. 934 (2010); *United States v. Battle*, 347 F. App'x 478, 480 (11th Cir. 2009) (per curiam); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009), *cert. denied*, 559 U.S. 970 (2010); *United States v. Smith*, 329 F. App'x 109, 110–11 (9th Cir. 2009); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009).

However, courts of appeals are split as to whether *as-applied* Second Amendment challenges to § 922(g)(1) are viable. On the one hand, the Fifth, Sixth, Ninth, Tenth, and Eleventh Circuits have suggested that § 922(g)(1) is always constitutional as applied to felons as a class, regardless of their individual circumstances or the nature of their offenses. *See Stimmel v. Sessions*, 879 F.3d 198, 210 (6th Cir. 2018) ("[W]e have upheld § 922(g)(1), which disarms even non-violent felons." (citing *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010), *cert. denied*, 562 U.S. 895 (2010))); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010), *cert. denied*, 562 U.S. 867 (2010) (rejecting as-applied Second Amendment challenge and holding that felon dispossession laws are constitutional even if the offense was nonviolent in nature); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010), *cert. denied*, 560 U.S. 958 (2010) (concluding that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment," and holding that § 922(g)(1) is "a constitutional avenue to restrict the Second Amendment right of certain classes of people," including convicted felons); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), *cert. denied*, 562 U.S. 921 (2010) (rejecting nonviolent felon's as-applied Second Amendment challenge to § 922(g)(1) because "felons are categorically different from the individuals who have a fundamental right to bear arms"); *In re U.S.*, 578 F.3d 1195, 1200 (10th Cir. 2009) ("We have already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1)." (citing *McCane*, 573 F.3d at 1047)).

The First Circuit has not foreclosed as-applied challenges, but it has expressed some skepticism about them. In *United States v. Torres-Rosario*, the court rejected the defendant's as-

applied challenge because he had two prior convictions for "serious drug offenses." 658 F.3d 110, 113 (1st Cir. 2011), *cert. denied*, 565 U.S. 1271 (2012). However, the court noted that the Supreme Court "may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban," and "might even be open to highly fact-specific objections." *Id.* Yet the First Circuit cautioned that "such an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning." *Id.*

On the other hand, we, along with the Fourth, Eighth, and D.C. Circuits, have left room for as-applied challenges to the statute. *See United States v. Williams*, 616 F.3d 685, 693 (7th Cir. 2010), *cert. denied*, 563 U.S. 1092 (2010) ("[W]e recognize that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent."); *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) ("We need not decide today if it is ever possible for a convicted felon to show that he may still count as a 'law-abiding, responsible citizen'" entitled to Second Amendment protections.); *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014) ("[T]he Eighth Circuit has left open the possibility that a person could bring a successful as-applied challenge to § 922(g)(1)" but rejected defendant's as-applied challenge because he had multiple violent felony convictions.); *United States v. Pruess*, 703 F.3d 242, 247 (4th Cir. 2012) (holding that § 922(g)(1) could constitutionally be applied to nonviolent felons, but acknowledging that "there in theory might be an as-applied Second Amendment challenge to [§] 922(g)(1) that could succeed" (citations and internal quotation marks omitted)).

Neither we, nor the Fourth, Eighth, or D.C. Circuits, however, have ever actually upheld such a challenge in practice. In fact, we have repeatedly rejected as-applied Second Amendment challenges to § 922(g). *See Baer v. Lynch*, 636 F. App'x 695, 698 (7th Cir. 2016) (holding that § 922(g)(1) could constitutionally be applied to individual convicted of felony robbery); *United States v. Shields*, 789 F.3d 733, 750–51 (7th Cir. 2015) (concluding that § 922(g)(1) was constitutional as applied to individual who had been convicted of three violent felonies); *Williams*, 616 F.3d at 693–94 (holding that § 922(g)(1) was constitutional as applied to individual convicted of felony robbery who "beat[] the victim so badly that the victim required sixty-five stitches"); *United States v. Skoien*, 614 F.3d 638, 642, 644 (7th Cir. 2010) (en banc) (rejecting as-applied Second Amendment challenge to § 922(g)(9) brought by domestic violence misdemeanant because violence was "an element of the offense" and data suggested high rates of recidivism).

Indeed, only one federal court of appeals has upheld an as-applied Second Amendment challenge to § 922(g). In a fractured en banc decision, a narrow majority of the Third Circuit (eight out of fifteen judges) held that § 922(g)(1) was unconstitutional as applied to two individuals convicted of a misdemeanor for corrupting a minor and a misdemeanor for unlawfully carrying a handgun without a license, respectively. *Binderup*, 836 F.3d at 340, 356. Because it is the only successful as-applied Second Amendment challenge in a court of appeals to date—and because Kanter relies heavily upon it—it is worth examining the case at some length.

Seven members of the Third Circuit reasoned that the historical justification for disarming felons was "tied to the concept of a virtuous citizenry," and that "persons who have

committed serious crimes forfeit the right to possess firearms much the way they forfeit other civil liberties." *Id.* at 348–49 (plurality opinion) (citations and internal quotation marks omitted). Applying the civic virtue rationale, three of those judges concluded that the challengers' offenses "were not serious enough to strip them of their Second Amendment rights." *Id.* at 351. They explained that, although the two offenses were punishable by more than a year in prison, and thus met the definition of a felony in § 922(g), the state legislatures had enacted them as misdemeanors, and "a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying." *Id.* Those judges also considered that neither of the offenses at issue involved violence and that each of the challengers received "a minor sentence," and they pointed to the lack of a "cross-jurisdictional consensus regarding the seriousness of the [c]hallengers' crimes," remarking that in some states the challengers' conduct was not even illegal. *Id.* at 352. At step two, those three judges concluded that § 922(g)(1) did not survive intermediate scrutiny because the government relied on "off-point statistical studies" that involved incarcerated felons, not misdemeanants who had served no jail time. *Id.* at 354.

By contrast, the other five judges who upheld the as-applied challenge believed that the exclusion of felons from the scope of the Second Amendment's protections was not rooted in notions of civic virtue, but rather "the time-honored principle that the right to keep and bear arms does not extend to those likely to commit violent offenses." *Id.* at 367 (Hardiman, J., concurring in part and concurring in the judgments). Applying dangerousness as the touchstone, those judges concluded that persons like the challengers who were convicted

of nonviolent offenses fall within the scope of the Second Amendment's protection. *Id.* at 375–76. Moreover, those five judges believed that § 922(g) was "categorically unconstitutional" when applied to "non-dangerous persons convicted of offenses unassociated with violence," such that any subsequent means-end scrutiny or judicial interest balancing was "inappropriate." *Id.* at 358, 378.

The seven dissenting judges concluded that as-applied challenges to § 922(g)(1) are *never* permissible. *Id.* at 401 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgments). In doing so, they stressed that the majority's decision to uphold such a challenge was unprecedented. *See id.* at 380–81 ("The plaintiffs ask us to do something that no federal appellate court has done before.… No federal appellate court has yet upheld a challenge, facial or as-applied, to the felon-in-possession statute."). They criticized the majority's approach because it "saddle[s] district court judges with a seemingly unending obligation to review as-applied challenges" and "fail[s] to provide us with any workable standards that would make such a regime administratively feasible or doctrinally coherent." *Id.* at 380. According to the dissent, the challengers' claim failed at step one because "*Heller* itself tells us that felons are disqualified from exercising their Second Amendment rights," and "there is no principled basis … for distinguishing felons from misdemeanants who commit crimes punishable by more than two years in prison." *Id.* at 388. In any event, the dissenting judges concluded that § 922(g)(1) survives intermediate scrutiny because the government's studies established a link between past criminal conduct and the government's important interest in preventing future gun violence. *See id.* at 400–01. With

respect to plaintiffs' contention that the studies were not tailored to their specific characteristics, the dissenting judges explained that "[t]he question is not whether someone *exactly like the plaintiffs* poses a threat to public safety," but rather "whether the fit between the challenged regulation and the asserted objective [is] reasonable, not perfect." *Id.* at 400 (alteration in original) (citation and internal quotation marks omitted).[4]

With this background in mind, we now apply our two-step test to this case.

## C. Step One: The Historical Evidence is Inconclusive as to Whether Felons Were Categorically Excluded From the Second Amendment's Scope

The first question is whether nonviolent felons as a class historically enjoyed Second Amendment rights. *Heller* did not answer this question. True, "some of *Heller*'s language does link Second Amendment rights with the notion[] of 'law-abiding citizens.'" *Meza-Rodriguez*, 798 F.3d at 669; *see also Heller*, 554 U.S. at 634–35 (observing that the "core" of the Second Amendment right is "the right of *law-abiding*, responsible citizens to use arms in defense of hearth and home" (emphasis added)). The *Heller* Court also cautioned that nothing in its decision "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons," which it referred to as "presumptively lawful." 554 U.S. at 626–27 & n.26. Moreover, the Court mentioned that certain individuals may

---

[4] Both parties appealed to the Supreme Court, but the Supreme Court denied the petitions for writ of certiorari. *See Sessions v. Binderup*, 137 S. Ct. 2323 (2017) (noting Justices Ginsburg and Sotomayor would grant the petition); *Binderup v. Sessions*, 137 S. Ct. 2323 (2017) (same).

be "disqualified from the exercise of Second Amendment rights." *Id.* at 635. However, the Court never actually addressed the historical pedigree of felon dispossession laws. Accordingly, we have refused to read too much into the Court's "precautionary language." *Skoien*, 614 F.3d at 640; *see also Meza-Rodriguez*, 798 F.3d at 669 ("We are reluctant to place more weight on these passing references than the Court itself did.").[5]

Nor has the Seventh Circuit decided whether felons were historically outside the scope of the Second Amendment's protection. *See Baer*, 636 F. App'x at 698. Although the litigants in *Williams* raised that question, we declined to address it and proceeded directly to the intermediate scrutiny analysis. 616 F.3d at 692. In so doing, we noted that "[t]he academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is 'inconclusive at best,' and we refrain[ed] … from making a determination based on contradictory views." *Id.* (quoting *Skoien*, 614 F.3d at 650 (Sykes, J., dissenting)).

To be sure, although we have not expressly decided this issue before, we have suggested that felons were not historically understood to have Second Amendment rights. For example, in *Skoien*, which involved domestic violence misdemeanants, we explained that some "categorical limits" on firearm possession were "part of the original meaning" of the Second Amendment. 614 F.3d at 640. Similarly, in *United*

---

[5] *But see Berron v. Ill. Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) ("When holding in [*Heller*] that the Second Amendment establishes personal rights, the Court observed that only law-abiding persons enjoy these rights, even at home.").

*States v. Yancey*, we opined that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens,'" including felons. 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (quoting *Vongxay*, 594 F.3d at 1118).[6]

If, as we suggested in *Yancey* and as most scholars have concluded, the founders conceived of the right to bear arms as belonging only to virtuous citizens, even nonviolent felons like Kanter would fall outside the scope of the Second

---

[6] Indeed, numerous legal historians have endorsed this view. *See, e.g.,* Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002) ("Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right [that] … was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner."); Robert Dowlut, *The Right to Arms: Does the Constitution or the Predilection of Judges Reign?*, 36 Okla. L. Rev. 65, 96 (1983) ("Colonial and English societies of the eighteenth century … excluded … felons [from possessing firearms]."); Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 Mich. L. Rev. 204, 266 (1983) ("Felons simply did not fall within the benefits of the common law right to possess arms."); Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment*, 62 Tenn. L. Rev. 461, 480 (1995) ("One implication of this emphasis on the virtuous citizen is that the right to arms does not preclude laws disarming the unvirtuous (i.e. criminals) …." (citation omitted)). Moreover, according to Thomas M. Cooley's 1868 Treatise on Constitutional Limitations, which the *Heller* court described as a "massively popular" treatise written by "[t]he most famous" late-nineteenth-century legal scholar, 554 U.S. at 616, certain classes of people were "almost universally excluded" from exercising certain civic rights, including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 29 (1st ed. 1868).

Amendment. Indeed, several courts of appeals have concluded that nonviolent felons are outside the scope of the Second Amendment. For example, in *Hamilton v. Pallozzi*, the Fourth Circuit rejected a nonviolent felon's as-applied Second Amendment challenge to a state felon dispossession statute, holding that "conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for purposes of the Second Amendment." 848 F.3d 614, 626 (4th Cir. 2017). Explaining that the defendant could not rebut the presumption that he fell outside the category of "'law-abiding, responsible citizens,'" the court focused on his felony conviction for fraud and theft crimes: "Theft, fraud, and forgery are not merely errors in filling out a form or some regulatory misdemeanor offense; these are significant offenses reflecting disrespect for the law." *Id.* at 627 (quoting *Heller*, 554 U.S. at 635); *see also Medina*, 913 F.3d at 160 ("Whether a certain crime removes one from the category of 'law-abiding and responsible,' in some cases, may be a close question," such as "a misdemeanor arising from a fistfight …. Those who commit felonies however, cannot profit from our recognition of such borderline cases."); *United States v. Hughley*, 691 F. App'x 278, 279 (8th Cir. 2017) (per curiam) ("Restricting gun possession by felons—even nonviolent ones—differs meaningfully from restricting citizens who have not been convicted of serious offenses from having guns in their home for self-defense."); *Vongxay*, 594 F.3d at 1115–16 ("declin[ing] to make a distinction between violent and non-violent felons" because "felons are categorically different from the individuals who have a fundamental right to bear arms"); *Rozier*, 598 F.3d at 771 & n.5 (stating that a nonviolent felon's "Second Amendment right to bear arms is not weighed in the same manner as that of a law-abiding citizen" and analogizing felon-dispossession

statutes to felon disenfranchisement laws); *United States v. Everist*, 368 F.3d 517, 519 (5th Cir. 2004) ("Irrespective of whether his offense was violent in nature, a felon has shown manifest disregard for the rights of others. He may not justly complain of the limitation on his liberty when his possession of firearms would otherwise threaten the security of his fellow citizens.").[7]

On the other hand, as Judge Sykes observed in her dissent in *Skoien*, there is scholarly "disagree[ment] about the extent to which felons … were considered excluded from the right to bear arms during the founding era," and "[t]he historical evidence is inconclusive at best." *Skoien*, 614 F.3d at 650 (Sykes, J., dissenting) (emphasis omitted).[8] If the founders were really

---

[7] Although *Everist* was issued before the *Heller* decision, the Fifth Circuit already recognized an individual right to bear arms pre-*Heller* and reaffirmed the validity of the *Everist* decision after *Heller*. *See Scroggins*, 599 F.3d at 451.

[8] For support for Judge Sykes's observation regarding the conflicting scholarship on the historical conception of the Second Amendment, *see, e.g.,* Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial* Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009) ("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("[A]ctual 'longstanding' precedent in America and pre-Founding England suggests that a firearms disability can be consistent with the Second Amendment to the extent that … its basis credibly indicates a present danger that one will misuse arms against others and the disability redresses that danger."); Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("The Founding generation had no laws … denying the right to people convicted of crimes.").

just concerned about dangerousness, not a lack of virtue, non-violent felons like Kanter arguably fall within the scope of the Second Amendment's protections.

Ultimately, we need not resolve this difficult issue regarding the historical scope of the Second Amendment to dispose of this case. Instead, we proceed to the means-end scrutiny of the government's objectives.[9]

**D. Step Two: The Felon Dispossession Statutes Survive Intermediate Scrutiny**

Categorical prohibitions on the possession of firearms by felons are "presumptively lawful," even in disqualifying non-violent felons like Kanter. *See Skoien*, 614 F.3d at 640 ("[S]uch a recent extension of [§ 922(g)(1)'s] disqualification to non-violent felons (embezzlers and tax evaders, for example) is presumptively constitutional, as *Heller* said in note 26."). But because "*Heller* referred to felon disarmament bans only as 'presumptively lawful,'" we require the government to "prov[e]

---

[9] In fact, we usually defer the threshold historical scope inquiry and proceed directly to means-end scrutiny. *See, e.g., Horsley v. Trame*, 808 F.3d 1126, 1131 (7th Cir. 2015) (declining to decide whether eighteen- to twenty-year-olds are within the scope of the Second Amendment); *Yancey*, 621 F.3d at 684–85. One notable exception to our generally restrained approach in this area is *United States v. Meza-Rodriguez*, 798 F.3d 664 (7th Cir. 2015). There, the majority held that undocumented immigrants were historically within the scope of the Second Amendment but ultimately concluded that the statute at issue nevertheless survived intermediate scrutiny. *Id.* at 669–73. The concurrence advocated for a "prudential approach" since we did not need to decide the threshold question to resolve the case, and proposed "reserv[ing] resolution of this challenging constitutional question for a case that compels addressing it." *Id.* at 673–74 (Flaum, J., concurring in the judgment). We think that prudential approach is appropriate here.

"the constitutionality of § 922(g)(1) … using the intermediate scrutiny framework." *Williams*, 616 F.3d at 692.

To survive intermediate scrutiny at step two, the government must show that the felon dispossession statute is substantially related to an important governmental objective. Consistent with how we apply intermediate scrutiny in the First Amendment context, the "fit" between the challenged regulation and the asserted governmental objective need only "be reasonable, not perfect." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010); *cf. FTC v. Trudeau*, 662 F.3d 947, 953 (7th Cir. 2011).[10]

The government has met its burden in this case. First, Kanter concedes that the government's objective in passing § 922(g)(1) was an important one. The government identifies its interest as preventing gun violence by keeping firearms away from persons, such as those convicted of serious crimes, who might be expected to misuse them. This formulation of the government's interest is consistent with our precedent in this area. *See Yancey*, 621 F.3d at 683 ("Congress enacted the exclusions in § 922(g) to keep guns out of the hands of pre-

---

[10] Our means-end review is arguably less rigorous in this case because the weight of the historical evidence summarized above suggests that felon dispossession laws do not restrict the "core right of armed defense," but rather burden "activity lying closer to the margins of the right." *Ezell II*, 846 F.3d at 892. Indeed, we have said that "the state can prevail with less evidence when, as in *Skoien*, guns are forbidden to a class of persons who present a higher than average risk of misusing a gun." *Moore*, 702 F.3d at 940. We have even gone so far as to say that "empirical evidence of a public safety concern can be dispensed with altogether when the ban is limited to obviously dangerous persons such as felons and the mentally ill." *Id.*

sumptively risky people."); *Williams*, 616 F.3d at 693 (describing the government's objective as "keep[ing] firearms out of the hands of violent felons, who the government believes are often those most likely to misuse firearms"); *Skoien*, 614 F.3d at 642 (describing the government's interest as "preventing armed mayhem"). And we have previously held that this interest is "without doubt an important one." *Yancey*, 621 F.3d at 684; *see also Meza-Rodriguez*, 798 F.3d at 673 ("[T]he government has a[] strong interest in preventing people who already have disrespected the law (including … felons …) from possessing guns.").

Second, the government has shown that prohibiting even nonviolent felons like Kanter from possessing firearms is substantially related to its interest in preventing gun violence. Before turning to the government's statistical evidence establishing such a link, it is important to note that we do not write on a blank slate. In *Yancey*, we explained that "most felons are nonviolent, but someone with a felony conviction on his record is more likely than a nonfelon to engage in illegal and violent gun use." 621 F.3d at 685. In fact, the D.C. Circuit has concluded that "nonviolent offenders not only have a higher recidivism rate than the general population, but certain groups—such as property offenders—have an even higher recidivism rate than violent offenders, and a large percentage of the crimes nonviolent recidivists later commit are violent." *Kaemmerling v. Lappin*, 553 F.3d 669, 683 (D.C. Cir. 2008); *see Ewing v. California*, 538 U.S. 11, 26 (2003) (citing P. Langan & D. Levin, U.S. Dep't of Justice, Bureau of Justice Statistics, *Special Report: Recidivism of Prisoners Released in 1994*, at 1 (June 2002)).

In addition to these judicial statements, the government points to several studies that have found a connection between nonviolent offenders like Kanter and a risk of future violent crime. For example, one study of 210,886 nonviolent offenders found that about one in five were rearrested for a violent crime within three years of his or her release. *See* U.S. Dep't of Justice, Bureau of Justice Statistics *Profile of Nonviolent Offenders Exiting State Prisons* 2, 4 (2004). A separate study found that 28.5 percent of nonviolent property offenders—a category that includes fraud convictions—were rearrested for a violent offense within five years of their release. *See* Matthew R. Durose, *et al.*, U.S. Dep't of Justice, Bureau of Justice Statistics, *Recidivism of Prisoner Released in 30 States in 2005: Patterns from 2005 to 2010*, at 9 (2014). Yet another study found that "even handgun purchasers with only 1 prior *misdemeanor* conviction and no convictions for offenses involving firearms or violence were nearly 5 times as likely as those with no prior criminal history to be charged with new offenses involving firearms or violence." Garen J. Wintemute, *et al.*, *Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns*, 280 J. Am. Med. Ass'n 2083, 2083 (1998) (emphasis added).[11]

---

[11] Even the study that Kanter relies upon found that approximately 40 percent of individuals convicted of mail fraud had at least one additional arrest afterward. David Weisburd & Elin Waring, *White-Collar Crime and Criminal Careers* 12, 29 (2004). The same study found that 24.5 percent of all repeat white-collar offenders had at least one violent arrest on their record. *Id.* at 45. In other words, "white-collar offenders often have multiple contacts with the criminal justice system" and "are unlikely to evidence a high degree of specialization." *Id.* at 49.

Kanter's only response to the government's statistical studies is that they are not tailored enough to his "individual circumstances." Specifically, Kanter asks the Court "to consider the fact that [he] is a first-time, non-violent offender with no history of violence, firearm misuses, or subsequent convictions." Kanter also points out that he is "employed, married, and does not use illicit drugs, all of which correspond with lower rates of recidivism." In short, Kanter argues that to meet its burden the government must show "a substantial relationship between denying *Mr. Kanter* a firearm and furthering the government's objective of preventing firearm misuse and armed violence."

Kanter is mistaken. In *Skoien* we held that "Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court. *Heller* did not suggest that disqualifications would be effective only if the statute's benefits are first established by admissible evidence." 614 F.3d at 641. Of course, not all nonviolent felons will later commit a violent crime with a firearm. In that sense, the statute is "somewhat over-inclusive." *United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012). However, that "does not undermine [the statute's] constitutionality … because it merely suggests that the fit is not a perfect one; a reasonable fit is all that is required under intermediate scrutiny." *Id.*; *see also Marzzarella*, 614 F.3d at 97–98 (analogizing to intermediate scrutiny in First Amendment context).

Here, unlike the challengers in *Binderup*, who were convicted of "non-serious" state misdemeanors and served no prison time, Kanter was convicted of a serious federal felony for conduct broadly understood to be criminal, and he did not

face a minor sentence. 836 F.3d at 353 & n.6. Instead, Kanter is more akin to the challenger in *Hamilton*, whose fraud and theft convictions were "black-letter *mala in se* felonies reflecting grave misjudgment and maladjustment." 848 F.3d at 627. Kanter's crime—defrauding the federal government out of hundreds of thousands of dollars—"reflect[s] significant disrespect for the law." *Id.* at 627 n.14; *see also Medina*, 913 F.3d at 160 (rejecting as-applied challenge where plaintiff was convicted of "felony fraud—a serious crime, malum in se, that is punishable in every state"). Thus, Kanter's serious felony conviction prevents him from challenging the constitutionality of § 922(g)(1) as applied to him.[12]

We are further assured in our decision because the highly-individualized approach Kanter proposes raises serious institutional and administrative concerns. *See Torres-Rosario*, 658 F.3d at 113 ("[S]uch an approach, applied to countless variations in individual circumstances, would obviously present serious problems of administration, consistency and fair warning."); *see also Medina*, 913 F.3d at 159–60 (rejecting argument that "non-dangerous felons have a right to bear arms"

---

[12] We decline to revisit our comment in *Williams* "that § 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." 616 F.3d at 693. That statement was dictum, and we need not determine whether § 922(g)(1) may ever be subject to an as-applied challenge to reach our decision in this case. There may be a case in the future that requires addressing whether any individual may successfully bring an as-applied challenge to the statute, but Kanter's is not that case. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973) ("[A] person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.").

because "[u]sing an amorphous 'dangerousness' standard to delineate the scope of the Second Amendment would require the government to make case-by-case predictive judgments before barring the possession of weapons"). As mentioned above, Congress previously allowed the ATF to restore a felon's gun rights under § 925(c) if the agency determined that "the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c). However, Congress abandoned that approach after finding that the dangerousness inquiry was a "very difficult" and time-intensive task, H.R. Rep. No. 102-618, at 14 (1992), and that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms." H.R. Rep. No. 104-183, at 15 (1995). Congress's failed attempt to delegate this investigative task to a law enforcement agency "should have a profound impact on our tailoring analysis." *Binderup*, 836 F.3d at 403 (Fuentes, J., concurring in part, dissenting in part, and dissenting from the judgment).

At bottom, the fact-specific inquiry Kanter asks this Court to undertake is "a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." *Bean*, 537 U.S. at 77; *see also Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) ("Unlike ATF, courts possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety."). Moreover, "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those

risks." *Schrader*, 704 F.3d at 990 (citation and internal quotation marks omitted).

In sum, the government has established that the felon dispossession statutes are substantially related to the important governmental objective of keeping firearms away those convicted of serious crimes. Because Kanter was convicted of a serious federal felony for conduct broadly understood to be criminal, his challenge to the constitutionality of § 922(g)(1) is without merit.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

BARRETT, *Circuit Judge*, dissenting. History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns. But that power extends only to people who are *dangerous*. Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons. Nor have the parties introduced any evidence that founding-era legislatures imposed virtue-based restrictions on the right; such restrictions applied to civic rights like voting and jury service, not to individual rights like the right to possess a gun. In 1791—and for well more than a century afterward—legislatures disqualified categories of people from the right to bear arms only when they judged that doing so was necessary to protect the public safety.

18 U.S.C. § 922(g)(1) and Wisconsin Statute § 941.29(1m) would stand on solid footing if their categorical bans were tailored to serve the governments' undeniably compelling interest in protecting the public from gun violence. But their dispossession of *all* felons—both violent and nonviolent—is unconstitutional as applied to Kanter, who was convicted of mail fraud for falsely representing that his company's therapeutic shoe inserts were Medicare-approved and billing Medicare accordingly. Neither Wisconsin nor the United States has introduced data sufficient to show that disarming all nonviolent felons substantially advances its interest in keeping the public safe. Nor have they otherwise demonstrated that Kanter himself shows a proclivity for violence. Absent evidence that he either belongs to a dangerous category or bears individual markers of risk,

permanently disqualifying Kanter from possessing a gun violates the Second Amendment.[1]

## I.

At the outset, it is worth clarifying a conceptual point. There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. *See, e.g.*, *Binderup v. Attorney Gen. U.S.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments) ("[T]he Founders understood that not everyone possessed Second Amendment rights. These appeals require us to decide who count among 'the people' entitled to keep and bear arms."). Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443, 1497–98 (2009) (describing these competing views). These approaches will typically yield the same result; one uses history and tradition to identify the scope of the right, and the other uses that same body of evidence to identify the scope of the legislature's power to take it away.

-------

[1] Because the federal and state statutes operate to the same effect as applied to Kanter, my analysis applies equally to both. For simplicity's sake, I often refer only to the federal statute. In addition, I sometimes refer to the statutes as imposing a "felon ban" or "felon dispossession" with the understanding that § 922(g)(1) also encompasses state misdemeanors punishable by more than two years in prison. *See* 18 U.S.C. § 921(a)(20)(B).

In my view, the latter is the better way to approach the problem. It is one thing to say that certain weapons or activities fall outside the scope of the right. *See District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) (explaining that "the sorts of weapons protected were those 'in common use at the time'" (citation omitted)); *Ezell v. City of Chicago*, 846 F.3d 888, 892 (7th Cir. 2017) (*Ezell II*) ("[I]f … the challenged law regulates activity falling outside the scope of the right as originally understood, then 'the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review.'" (citation omitted)); *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) (*Ezell I*) (drawing an analogy between categories of speech, like obscenity, that fall outside the First Amendment and activities that fall outside the Second Amendment). It is another thing to say that certain *people* fall outside the Amendment's scope. Arms and activities would always be in or out. But a person could be in one day and out the next: the moment he was convicted of a violent crime or suffered the onset of mental illness, his rights would be stripped as a self-executing consequence of his new status. No state action would be required.

To be sure, under this theory such a person could possess a gun as a matter of legislative grace. But he would lack standing to assert constitutional claims that other citizens could assert. For example, imagine that a legislature disqualifies those convicted of crimes of domestic violence from possessing a gun for a period of ten years following release from prison. *See United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010) (en banc) (holding constitutional 18 U.S.C. § 922(g)(9), which forbids those convicted of crimes of domestic violence to possess a gun). After fifteen years pass, a domestic violence misdemeanant challenges a handgun ban

identical to the one that the Court held unconstitutional in *Heller*. Despite the legislative judgment that such a person could safely possess a gun after ten years, a court would still have to determine whether the person had standing to assert a Second Amendment claim. If the justification for the initial deprivation is that the person falls outside the protection of the Second Amendment, it doesn't matter if the statutory disqualification expires. If domestic violence misdemeanants are out, they're out.[2]

That is an unusual way of thinking about rights. In other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints). Felon voting rights are a good example: a state can disenfranchise felons, but if it refrains from doing so, their voting rights remain constitutionally protected.[3] So too with

---

[2] Or at least that would be true absent the unlikely event that the Second Amendment, as originally understood, imposed a very specific restriction on the length of time that such a misdemeanant was excluded from the right.

[3] Felon disenfranchisement laws have a long history, and the Fourteenth Amendment's protection of the right to vote expressly acknowledges the authority of state legislatures to enact such laws. U.S. CONST. amend. XIV, § 2 (providing that a state's representation in the House will be reduced if the right to vote "is denied … or in any way abridged, except for participation in rebellion, or other crime"). The Second Amendment contains no similar acknowledgment. Legislative power to strip the right from certain people or groups was nonetheless a historically accepted feature of the pre-existing right that the Second Amendment protects. *See Heller*, 554 U.S. at 592 ("[T]he Second Amendment … codified a *pre-existing* right."); *id.* at 595 ("Of course the right was not unlimited …."); *Skoien*, 614 F.3d at 640 ("That *some* categorical limits are proper is part of the original meaning, leaving to the

the right to keep and bear arms: a state can disarm certain people (for example, those convicted of crimes of domestic violence), but if it refrains from doing so, their rights remain constitutionally protected. In other words, a person convicted of a qualifying crime does not automatically lose his right to keep and bear arms but instead becomes *eligible* to lose it.

In addition to being analytically awkward, the "scope of the right" approach is at odds with *Heller* itself. There, the Court interpreted the word "people" as referring to "all Americans." 554 U.S. at 580–81; *see also id.* at 580 (asserting that "the people" "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community" (citation omitted)). Neither felons nor the mentally ill are categorically excluded from our national community. That does not mean that the government cannot prevent them from possessing guns. Instead, it means that the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.

Thus, I treat Kanter as falling within the scope of the Second Amendment and ask whether Congress and Wisconsin can nonetheless prevent him from possessing a gun.

---

people's elected representatives the filling in of details."). Thus, such a regulation does not "infringe" the right to bear arms because the right was always qualified by the government's power to prevent the dangerous from exercising it.

## II.

*Heller* did not "undertake an exhaustive historical analysis … of the full scope of the Second Amendment," but it did offer a list of "presumptively lawful regulatory measures," including "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *See Heller*, 554 U.S. at 626–27 & n.26. Like the majority, I am "reluctant to place more weight on these passing references than the Court itself did." *See* Maj. Op. at 15 (quoting *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015)). The constitutionality of felon dispossession was not before the Court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear. For example, does "presumptively lawful" mean that such regulations are presumed lawful unless a historical study shows otherwise? Does it mean that as-applied challenges are available? Does the Court's reference to "felons" suggest that the legislature cannot disqualify misdemeanants from possessing guns? Does the word "longstanding" mean that prohibitions of recent vintage are suspect? As we observed in *Skoien*, judicial opinions are not statutes, and we don't dissect them word-by-word as if they were. 614 F.3d at 640. Thus, I agree with the majority that *Heller*'s dictum does not settle the question before us.

It does, however, give us a place to start. *Heller*'s reference endorses the proposition that the legislature can impose some categorical bans on the possession of firearms. *See id.* ("That *some* categorical limits are proper is part of the original meaning."). Our task is to determine whether *all* felons—violent and nonviolent alike—comprise one such category.

Wisconsin and the United States advance three basic historical arguments in support of this categorical exclusion. First, they say that there is some evidence suggesting that founding-era legislatures deprived felons of the right. Second, they argue that because the states put felons to death at the time of the founding, no one would have questioned their authority to take felons' guns too. And third, they insist that founding-era legislatures permitted only virtuous citizens to have guns, and felons are not virtuous citizens.

As I explain below, none of these rationales supports the proposition that the legislature can permanently deprive felons of the right to possess arms simply because of their status as felons. The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety. This is a category simultaneously broader and narrower than "felons"—it includes dangerous people who have not been convicted of felonies but not felons lacking indicia of dangerousness.

### A.

The best historical support for a legislative power to permanently dispossess all felons would be founding-era laws explicitly imposing—or explicitly authorizing the legislature to impose—such a ban. But at least thus far, scholars have not been able to identify any such laws. The only evidence coming remotely close lies in proposals made in the New Hampshire, Massachusetts, and Pennsylvania ratifying conventions. In recommending that protection for the right to arms be added to the Constitution, each of these proposals included limiting language arguably tied to

criminality. *See, e.g.*, Don B. Kates, Jr., *Handgun Prohibition and the Original Meaning of the Second Amendment*, 82 MICH. L. REV. 204, 222, 266 (1983); Steven P. Halbrook, *The Right of the People or the Power of the State: Bearing Arms*, 26 VAL. U. L. REV. 131, 147, 185 (1991); *see also* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 HARV. J.L. & PUB. POL'Y 695, 712 (2009) ("For relevant authority before World War I for disabling felons from *keeping* firearms, then, one is reduced to three proposals emerging from the ratification of the Constitution.").

A majority of the New Hampshire convention recommended that a bill of rights include the following protection: "Congress shall never disarm any citizen, *unless such as are or have been in actual rebellion*." *See* 1 JONATHAN ELLIOT, THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 326 (2d ed. 1891) (emphasis added). In the Massachusetts convention, Samuel Adams proposed to protect the right to arms with the following language: "And that the said Constitution be never construed to authorize Congress to … prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *See* 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 675, 681 (1971) (emphasis added). Finally, the influential Pennsylvania Minority suggested an addition stating: "That the people have a right to bear arms for the defense of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed, or real danger of public injury from individuals* …." 2 SCHWARTZ, *supra*, at 662, 665 (emphasis added). On the basis of these three proposals some conclude that "[a]ll the ratifying convention proposals which most

explicitly detailed the recommended right-to-arms amendment excluded criminals and the violent." *See, e.g.*, Kates, 82 MICH. L. REV. at 266.

Several things bear emphasis here. First, none of the relevant limiting language made its way into the Second Amendment. Second, only New Hampshire's proposal—the least restrictive of the three—even carried a majority of its convention. *See* 2 SCHWARTZ, *supra*, at 628, 675, 758. Third, proposals from other states that advocated a constitutional right to arms did not contain similar language of limitation or exclusion. *See* Kates, 82 MICH. L. REV. at 222 (citing 1 ELLIOT, *supra*, at 328, 335). And finally, similar limitations or exclusions do not appear in any of the four parallel state constitutional provisions enacted before ratification of the Second Amendment. *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 TEX. REV. L. & POL. 191, 208 (2006) (North Carolina, Pennsylvania, Vermont, Massachusetts). All that said, these proposals may "indicate some common if imprecise understanding at the Founding regarding the boundaries of a right to keep and bear arms." Marshall, 32 HARV. J.L. & PUB. POL'Y at 713. And at a minimum, the fact that they are routinely invoked in support of blanket felon disarmament makes it necessary to consider them.

I'll begin with the New Hampshire proposal, which did not embrace the disarmament of all felons, but rather of those citizens who "are or have been in *actual rebellion*." 1 ELLIOT, *supra*, at 326 (emphasis added). This limitation targeted a narrow group because "rebellion" was a very specific crime. *See Rebellion*, 2 NEW UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (4th ed. 1756) (explaining that the term is "now

used for a traiterous taking up arms, or a tumultuous opposing the authority of the king, etc. or supreme power in a nation"). There are obvious reasons why the government would take guns away from those bent on overthrowing it, and, as I discuss later, stripping rebels of their gun rights followed well-established practice in both England and the colonies. Thus, while this proposal reflects support for disarming rebels, it does not say anything about disarming those who have committed other crimes, much less nonviolent ones.

Samuel Adams's proposed language to the Massachusetts convention, which would have limited the right to "peaceable citizens," *see* 2 SCHWARTZ, *supra*, at 681, sweeps more broadly—but not so broadly that it encompasses all criminals, or even all felons. At the time, "peaceable" was defined as "[f]ree from war; free from tumult"; "[q]uiet; undisturbed"; "[n]ot violent; not bloody"; "[n]ot quarrelsome; not turbulent." 1 SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 1773). Those who "breach[ed] the peace" caused "[a] violation of the public peace, as by a riot, affray, or any tumult which is contrary to law, and destructive to the public tranquility." *See Breach*, NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828); *see also Atwater v. City of Lago Vista*, 532 U.S. 318, 327 & n.2 (2001) (noting some "variations in the common-law usage of the term 'breach of the peace'" but assuming that the definition "entail[ed] at least a threat of violence"); *id.* (quoting MICHAEL DALTON, THE COUNTRY JUSTICE 9 (1727) ("The Breach of th[e] Peace seemeth to be any injurious Force or Violence moved against the Person of another, his Goods, Lands, or other Possessions, whether by threatening words, or by furious Gesture, or Force of the Body, or any other Force used *in terrorem*.")); *Pearce v.*

*Atwood*, 13 Mass. 324, 332 (1816) ("Breaches of the peace comprise not only cases of actual violence to the person of another, but any unlawful acts, tending to produce an actual breach of the peace; whether the peace of the public, or an individual, be in fact disturbed or not."). Not all crimes are violent; nor, for that matter, is every non-peaceable person a criminal. In short, the phrase "peaceable citizens" was not a synonym for "non-felons" or even "non-criminals."

That leaves the strongest support for a blanket felon exclusion: the Pennsylvania Minority's suggested guarantee of the right to arms "unless for crimes committed, or real danger of public injury from individuals." 2 SCHWARTZ, *supra*, at 665. This proposal can be read in two ways. The first, which would support a broad exclusion, is to interpret it as capturing two groups: (1) those who have committed any crime—felony or misdemeanor, violent or nonviolent—and (2) those who have not committed a crime but nonetheless pose a danger to public safety. The second, which would support a more targeted exclusion, is to interpret it as capturing one group: those who pose a danger to public safety, whether or not they have committed a crime. On this reading, the catchall phrase limiting the rights of individuals who pose a "real danger of public injury" would be an effort to capture non-criminals whose possession of guns would pose the *same kind of danger* as possession by those who have committed crimes. And unless the founding generation understood *all* crimes—even nonviolent misdemeanors—to be markers for that risk, the relevant "crimes committed" would be the subset of crimes suggesting a proclivity for violence. (As far as I can find, no one even today reads this provision to support the disarmament of literally all criminals, even nonviolent misdemeanants.) If "crimes

committed" refers only to a subset of crimes, that subset must
be defined; using "real danger of public injury" to draw the
line is both internally coherent and consistent with founding-
era practice.

Whatever else may be said about the particulars of each of
these three proposals, they are most helpful taken together as
evidence of the scope of founding-era understandings
regarding categorical exclusions from the enjoyment of the
right to keep and bear arms. The concern common to all three
is not about felons in particular or even criminals in general;
it is about threatened violence and the risk of public injury.
*See Binderup*, 836 F.3d at 368 (Hardiman, J., concurring in part
and concurring in the judgments). This is the same concern
that animated English and early American restrictions on
arms possession.

In England, officers of the Crown had the power to disarm
anyone they judged to be "dangerous to the Peace of the
Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662).
Relatedly, English common law "punish[ed] people who
[went] armed to terrify the King's subjects" with
imprisonment and forfeiture of their "armour."[4] *Sir John*

---

[4] This common-law offense was adapted from the 1328 Statute of
Northampton, which decreed that a person may not "go nor ride armed
by night nor by day in fairs, markets, … nor in no part elsewhere, upon
pain to forfeit their armour to the King, and their bodies to prison at the
King's pleasure." Statute of Northampton, 2 Edw. 3, c. 3 (1328). By the
middle of the seventeenth century, the statute was "almost gone in
desuetudinem," because the law recognized "a general connivance to
gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep.
330, 330 (K.B. 1686). But it was still enforced against those who violated
the terms of the statute "malo animo," *id.*—that is, those who carried arms

*Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And—perhaps unsurprisingly because they were presumptively thought to pose a similar threat or terror—Parliament also disarmed Catholics. *See* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS 18–19, 122 (1994) (explaining that Protestants feared revolt, massacre, and counter-revolution from Catholics); *see also* ADAM WINKLER, GUNFIGHT 115 (2011) (explaining that Parliament disarmed Catholics because the Protestant majority found them "untrustworthy"); Marshall, 32 HARV. J.L. & PUB. POL'Y at 723 ("In short, the stated principle supporting the disability was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king.").[5]

Similar laws and restrictions appeared in the American colonies, adapted to the fears and threats of that time and place. *See* ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA 22 (2001) ("Although the colonial demand for such discriminatory controls sprang from circumstances different from those in England, as in applying them against Indians and blacks, colonists usually followed home-country practices of excluding other distrusted people from

---

with intent "to terrorize their neighbors," *see* JOYCE LEE MALCOLM, TO KEEP AND BEAR ARMS at 104 (1994).

[5] To be sure, the American experience does not map on exactly to the English one. For one thing, the right protected by the Second Amendment was decidedly broader than the one protected in the English Bill of Rights. *See* MALCOLM, *supra*, at 162. Still, the American version was derived from its English predecessor, *see id.* at 150, 164, which makes English practice instructive. That is especially true when the patterns from English practice repeat themselves in American law.

ownership."). In some places, Catholics were still disarmed, but "on the basis of allegiance, not on the basis of faith." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 157 (2007) (citing Virginia's 1756 "disarmament of all those refusing the test of allegiance")[6]; *see also* DECONDE, *supra*, at 22–23 (associating Catholics with the "distrusted inhabitants" from whom the colonies seized guns "with the intent of preventing social upheavals" and "rebellion"). Those "willing to swear undivided allegiance to the sovereign" were permitted to keep their arms. *See* Churchill, 25 LAW & HIST. REV. at 157. After all, confiscation of guns from those who refused to swear an oath of allegiance was meant to "deal with the potential threat coming from armed citizens who remained loyal to" another sovereign. *See* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004); *see also NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) ("American legislators had determined that permitting [those who refused to swear an oath of allegiance] to keep and bear arms posed a potential danger."). But that particular threat dissipated when a person pledged his allegiance to the United States or to a particular state.

---

[6] First, the allegiance required was to the Crown, and later, it was to the sovereign and independent states. *See id.* at 159 & n.49 (quoting 4 JOURNALS OF THE CONTINENTAL CONGRESS, 1774–1789, at 201–05 (1906) (calling for the disarmament of those "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies")).

Slaves and Native Americans, on the other hand, were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course. *See* MALCOLM, *supra*, at 140–41; WINKLER, *supra*, at 115–16 (noting "forcible disarmament" out of "fear that these groups would use guns to revolt" or otherwise threaten the "public safety"); DECONDE, *supra*, at 21–22 (noting "anxiety that slaves would rebel"). And this practice of keeping guns out of the hands of "distrusted" groups continued after the Revolution. For example, many states even constitutionalized the disarmament of slaves and Native Americans. *See* Volokh, 11 TEX. REV. L. & POL. at 208–09.[7]

In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety. But neither the convention proposals nor historical practice supports a legislative power to categorically disarm felons because of their status as felons.

## B.

A common response to the dearth of felon-disarmament laws in the eighteenth and nineteenth centuries is to say that such laws would have been unnecessary given the severity with which felons were punished. Because felons were routinely executed or stripped of all rights, the argument goes, explicit provisions depriving them of firearms would have been redundant. *See, e.g.*, Brief of Defendant-Appellee Brad D. Schimel at 9 ("[I]n eighteenth-century America, felonies were punishable by death, so no early American

---

[7] It should go without saying that such race-based exclusions would be unconstitutional today.

lawmaker would have questioned the propriety of a proposal to disarm serious offenders."); *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) ("[I]t is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."). One scholar puts it this way:

> The constitutionality of [bans on felon possession] cannot seriously be questioned … [because f]elons simply did not fall within the benefits of the common law right to possess arms. That law punished felons with automatic forfeiture of all goods, usually accompanied by death. We may presume that persons confined in gaols awaiting trial on criminal charges were also debarred from the possession of arms.

Kates, 82 MICH. L. REV. at 266. On this view, the criminal law provides a historical justification for felon disarmament even if laws regulating gun safety do not.

The premise of this argument—that the states permanently extinguished the rights of felons, either by death or operation of law, in the eighteenth and nineteenth centuries—is shaky. While it accurately describes the punishment of felons at English common law, the American picture is far more complex. It is true that at common law, the "idea of felony" was intertwined with the punishments of death and civil death. 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 98 (1769) ("The idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them …."); *Avery v. Everett*, 18 N.E. 148, 150 (N.Y. 1888) ("By the ancient common law … [t]here were three principle incidents

consequent upon an attainder for treason or felony, forfeiture, corruption of blood, and an extinction of civil rights, more or less complete, which was denominated civil death."). Civil death was a state in which a person "though living, was considered dead"—a status "very similar to natural death in that all civil rights were extinguished." *See* Harry David Saunders, Note, *Civil Death—A New Look at an Ancient Doctrine*, 11 WM. & MARY L. REV. 988, 988–89 (1970). As originally conceived, civil death signified "a transitional status in the period between a capital sentence and its execution." Gabriel J. Chin, *The New Civil Death: Rethinking Punishment in the Era of Mass Incarceration*, 160 U. PA. L. REV. 1789, 1797 (2012). It "was intended to merely settle the estate of an executed or banished felon." Saunders, 11 WM. & MARY L. REV. at 990.

During the period leading up to the founding, the connection between felonies and capital punishment started to fray. Once a short, specified list of offenses, felonies in England grew to "no less than an hundred and sixty," which is likely what forced Blackstone to define them in terms of their most common characteristic: capital punishment. *See* 4 BLACKSTONE, *supra*, at 18, 97–98. But as the number of designated felonies continued to grow, so did the variations on punishment, especially in the American colonies. Throughout the seventeenth and eighteenth centuries, capital punishment in the colonies was used "sparingly," and property crimes including variations on theft, burglary, and robbery "were, on the whole, not capital." LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY 42 (1993). By the time the Constitution was ratified, James Wilson observed that while the term "felony" was once "very strongly connected with capital punishment," that was no

longer true. JOHN D. BESSLER, CRUEL & UNUSUAL 52–53 (2012) (quoting 2 THE WORKS OF JAMES WILSON 348 (James DeWitt Andrews ed., 1896)); *see also* 6 NATHAN DANE, DIGEST OF AMERICAN LAW 715 (1823) ("[W]e have many felonies, not one punished with forfeiture of estate, and but a very few with death."). Of course, many crimes remained eligible for the death penalty, and the extent to which that was true varied by state. Death, however, no longer inevitably followed a felony conviction.

Because it was no longer defined with reference to a list of specific crimes or even a specific punishment, the definition of "felony" was difficult to pin down at the time of the founding. *See* Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 CLEV. ST. L. REV. 461, 465 (2009) (emphasizing the "ambiguity in the meaning of felony" at the founding). According to James Madison, "felony" was "a term of loose signification even in the common law of England," but more so in the States where "[t]he meaning of the term … [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." THE FEDERALIST NO. 42, at 228 (J. R. Pole ed., 2005); *see also* DANE, *supra*, at 715 ("[T]he word *felony*, in the process of many centuries, has derived so many meanings from so many parts of the common law, and so many statutes in England, and has got to be used in such a vast number of different senses, that it is now impossible to know precisely in what sense we are to understand this word.").

The shift in punishment for felonies necessitated a shift in the meaning of civil death, which had been previously connected to a capital sentence. And so civil death came to be understood "as an incident of life conviction." *See* Saunders,

11 WM. & MARY L. REV. at 990; *see also Troup v. Wood*, 4 Johns. Ch. 228, 248 (N.Y. Ch. 1820) (a person convicted of felony and sentenced to imprisonment in the state prison for life is "*civiliter mortuus*"). But applying the ancient concept of civil death in this context proved difficult. Because "[i]mprisonment for life was a punishment unknown to the common law," courts quickly realized that common-law civil death did not automatically apply. *See Platner v. Sherwood*, 6 Johns. Ch. 118, 122 (N.Y. Ch. 1822) (¶ 2 argument of Butler and Henry, counsel for the plaintiff); *id*. at 128 (Opinion of the Chancellor). Thus, courts soon decided that civil death applied only when statutes explicitly attached it to life sentences, and statutes did not universally do so. *Id.* at 129 (holding that a person convicted of a felony and sentenced to life imprisonment was not "deemed and taken to be civilly dead, to all intents and purposes in the law" until an act of the legislature made it so)[8]; *see also Frazer v. Fulcher*, 17 Ohio 260,

---

[8] The same court had two years earlier suggested that where a statute changed punishment from death to a life sentence, the statute may be read as an affirmance of the common law punishment of civil death. *See Platner*, 6 Johns. Ch. at 127–28 (citing *Troup*, 4 Johns. Ch. 228)). But in *Platner*, the court explicitly rejected its earlier assumption and replaced it with a well-reasoned, widely-adopted, and enduring view that civil death existed only if authorized by statute. *Id*. at 128 ("The same point arose, incidentally, in respect to this same conviction, in the case of *Troup v. Wood*, and I was there induced to think, upon the authority of Lord *Coke*, that every person attainted of felony was accounted, in law, *civiliter mortuus*. It was not a necessary or very material point in that case, and I did not pursue the subject to the extent I should have done, if it had been then, as it is now, the direct and material point in issue. I have, likewise, since, had the benefit of a full and able discussion, and of a diligent and accurate research, particularly on the part of the plaintiff, respecting this very unusual question of law." (citation omitted)).

262 (1848) ("But it is said that, by the rules of the common law, there is such a thing as a civil death as well as a natural death. We know that in England there are cases in which a man, although in full life, is said to be civilly dead, but I have not learned, until this case was brought before us, that there was but one kind of death known to our laws."); *Cannon v. Windsor*, 1 Houst. 143, 144 (Del. 1855) ("But here there is no such general forfeiture of property, or the right to maintain an action, on a conviction for treason or felony, and the maxim or principle of *civilter mortuus* cannot therefore apply in this State, even when he is a party plaintiff."); Chin, 160 U. PA. L. REV. at 1796 ("In England, civil death was a common law punishment, but in the United States, it existed only if authorized by statute. It was far from universal…."). And even when it applied to life sentences, the doctrine of civil death had to be at least partially reconceived because it had begun as a time-limited doctrine justified by the anticipation of natural death—it was "not a condition applicable potentially for decades." *See* Chin, 160 U. PA. L. REV. at 1797. As courts hammered out the incongruities between civil death and continued life over the next century, they settled uncomfortably on an American version of civil death that required explicit statutory authorization and deprived a felon of many, but not all, rights.[9] *See, e.g., Avery*, 18 N.E. at 154–55

---

[9] Courts were consistent and explicit about the difficulty of trying to apply the doctrine of civil death outside the context of the death penalty. *See, e.g., Shapiro v. Equitable Life Assur. Soc. of U.S.*, 45 N.Y.S.2d 717 (N.Y. Sup. Ct. 1943) ("Palpable anomaly inevitably results from attempting to attribute civil death, not only to persons about to be executed, but, also, to persons who may remain physically alive for many years and also may be paroled of pardoned."); *Byers v. Sun Sav. Bank*, 139 P. 948, 949 (Okla. 1914) ("[Civil death] had its origin in the fogs and fictions of feudal

(suggesting that a life convict maintained a right to defend an action brought against him and certain property rights, including the ability to transfer property by will or deed).

Of particular relevance to Kanter's case, courts also struggled to determine how—if at all—the old concept of civil death applied to felons serving sentences for a term of years. Cases decided in the early nineteenth century, like *Troup v. Wood* and *Platner v. Sherwood*, associated the *loss* of rights under a theory of civil death only with capital and life sentences. Later cases building on that reasoning held that the rights of felons serving less than life were merely *suspended* during the term of the sentence. *See, e.g.*, *In re Estate of Nerac*, 35 Cal. 392, 396 (1868) ("If the convict be sentenced for life, he becomes *civiliter mortuus*, or dead in law …. If, however, he be sentenced for a term less than life, his civil rights are only suspended during the term."); *Ruffin v. Commonwealth*, 62 Va. 790, 796 (1871) (explaining that a convict is "*civiliter mortuus*," but only "[f]or the time being, during his term of service in

---

jurisprudence and doubtlessly has been brought forward into modern statutes without fully realizing either the effect of its literal significance or the extent of its infringement upon the spirit of our system of government. At any rate, the full significance of such statutes have never been enforced by our courts for the principal reason that they are out of harmony with the spirit of our fundamental laws and with other provisions of statutes."); *Avery*, 18 N.E. at 155 ("Any one who takes the pains to explore the ancient and in many respects obsolete learning connected with the doctrine of civil death in consequence of crime, will find that he has to grope his way along paths marked by uncertain, flickering, and sometimes misleading lights; and he cannot feel sure that at some point in his course he has not missed the true road."). But here, defining the precise impact of "civil death" on a felon sentenced to life is not as important as underscoring that the impact was no longer complete destruction of rights and death to the law.

the penitentiary"); *Bowles v. Habermann*, 95 N.Y. 246, 247 (1884) (applying a statute, which provided that "a sentence of imprisonment in a State prison for any term less than for life … suspends, during the term of the sentence, all the civil rights … of, or held by, the person sentenced.").

The upshot of this history for present purposes is that the consequences of a felony conviction were not as categorically severe as the governments suggest. Capital punishment was less pervasive than one might think. Outside the capital context, civil death applied exclusively to life sentences and only if authorized by statute—and even then, it was more modest than the ancient version because the convict retained some rights. Felons serving a term of years did not suffer civil death; their rights were suspended but not destroyed. In sum, a felony conviction and the loss of all rights did not necessarily go hand-in-hand.

Because they did not go hand-in-hand, the argument that the severity of punishment at the founding implicitly sanctions the blanket stripping of rights from all felons, including those serving a term of years, is misguided. Those who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of law. This is not to say that felons could not lose rights under another theory. Indeed, state legislatures did explicitly exclude felons from the enjoyment of particular rights. *See infra* Section II.C. But history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class.

Even if it could be, though, one might reasonably ask: "So what?" We wouldn't draw this inference from the severity of founding-era punishment in other contexts—for example, we wouldn't say that the state can deprive felons of the right to free speech because felons lost that right via execution at the time of the founding. The obvious point that the dead enjoy no rights does not tell us what the founding-era generation would have understood about the rights of felons who lived, discharged their sentences, and returned to society.

### C.

While scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms, history does show that felons could be disqualified from exercising certain rights—like the rights to vote and serve on juries—because these rights belonged only to virtuous citizens. *See* THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS 29 (1st ed. 1868) (explaining that certain classes of people were "almost universally excluded" from the franchise for "want of capacity or of moral fitness"); Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. KY. L. REV. 657, 679 (2002) (identifying the "right to sit on juries" as "limited to those members of the polity who were deemed capable of exercising it in a virtuous manner"). Some maintain that the right to bear arms is similarly limited by a virtue requirement. *See, e.g.*, Don. B. Kates Jr., *The Second Amendment: A Dialogue*, 49 LAW & CONTEMP. PROBS., Winter 1986, at 143, 146 ("[T]he right to arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue."). On this view, the legislature can disarm

felons because of their poor character, without regard to whether they are dangerous. *See Medina*, 913 F.3d at 159 (endorsing the view that the Second Amendment excludes not only the dangerous, but also the "unvirtuous") The majority is sympathetic to this view. *See* Maj. Op. at 16.

The problem with this argument is that virtue exclusions are associated with civic rights—individual rights that "require[] citizens to act in a collective manner for distinctly public purposes." *See* Saul Cornell, *A New Paradigm for the Second Amendment*, 22 LAW & HIST. REV. 161, 165 (2004). For example, the right to vote is held by individuals, but they do not exercise it solely for their own sake; rather, they cast votes as part of the collective enterprise of self-governance. Similarly, individuals do not serve on juries for their own sake, but as part of the collective enterprise of administering justice. Some scholars have characterized the right to keep and bear arms as a civic right, because it was "one exercised by citizens, not individuals …, who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia." *See* Cornell & DeDino, 73 FORDHAM L. REV. at 491 ("[T]he text [of the Second Amendment] fits a civic rights model better than either the individual or collective rights paradigms."). Saul Cornell explains:

> Perhaps the most accurate way to describe the dominant understanding of the right to bear arms in the Founding era is as a civic right. Such a right was not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner. Freedom of religion, freedom of the press, trial by jury were

> genuinely rights belonging to individuals and
> were treated differently than were civic rights
> such as militia service, or the right to sit on
> juries.

Cornell, 29 N. KY. L. REV. at 679 (footnotes omitted). And as a right that was exercised for the benefit of the community (like voting and jury service), rather than for the benefit of the individual (like free speech or free exercise), it belonged only to virtuous citizens.

*Heller*, however, expressly rejects the argument that the Second Amendment protects a purely civic right. *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012). It squarely holds that "the Second Amendment confer[s] *an individual right* to keep and bear arms," *Heller*, 554 U.S. at 595 (emphasis added), and it emphasizes that the Second Amendment is rooted in the individual's right to defend himself—*not* in his right to serve in a well-regulated militia, *id.* at 582–86. The "civic rights" approach runs headlong into both propositions. *See Binderup*, 836 F.3d at 371 (Hardiman, J., concurring in part and concurring in the judgments) ("[T]his virtuous-citizens-only conception of the right to keep and bear arms is closely associated with pre-*Heller* interpretations of the Second Amendment by proponents of the 'sophisticated collective rights model' who *rejected* the view that the Amendment confers an individual right and instead characterized the right as a 'civic right ….'" (citation omitted)). The parties have introduced no evidence that virtue exclusions ever applied to individual, as opposed to civic, rights.[10] And if virtue

---

[10] The governments gesture towards *Heller* as support for a virtue exclusion, citing *Heller*'s assertion that the Second Amendment "surely

exclusions don't apply to individual rights, they don't apply to the Second Amendment.

It bears emphasis that virtue exclusions from the exercise of civic rights were explicit. If the right to bear arms was similarly subject to a virtue exclusion, we would expect to see provisions expressly depriving felons of that right too—but we don't. By 1820, ten states' constitutions included provisions excluding or authorizing the exclusion of those who "had committed crimes, particularly felonies or so-called infamous crimes" from the franchise. *See* ALEXANDER KEYSSAR, THE RIGHT TO VOTE 62–63 & tbl. A.7 (Kentucky, Vermont, Ohio, Louisiana, Indiana, Mississippi, Connecticut, Illinois, Alabama, Missouri). By 1857, twenty-four state constitutions included such provisions. *Id.* The same crimes often "made a person ineligible to serve as a witness in a legal proceeding," *id.* at 62, and to serve on a jury.[11]

---

elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. at 635. That statement implies that the legislature might have the power to more heavily regulate those who are not law-abiding or responsible. But it does not purport to analyze the scope of that power, nor does it endorse the very specific concept of a virtue exclusion.

[11] *See, e.g.*, Act of Feb. 28, 1803, ch. 92, § 1, *in* ACTS AND LAWS OF THE COMMONWEALTH OF MASSACHUSETTS 173 (Wright & Potter 1898) (jurors must be "of good Moral Character" and qualified to vote; "and if any person, whose name shall be put into either [jury] Box, shall be convicted of any Scandalous crime, or be guilty of any gross immorality, his name shall be withdrawn from the [jury] Box, by Selectmen of his town"); Act of Feb. 2, 1811, ch. 158, § 2, *in* 4 LAWS OF THE STATE OF DELAWARE, at 445, 449 (Bradford & Porter 1816) (grand jurors must be "sober, substantial and judicious freeholders, lawful men, of fair characters"); *id.* § 7 (petit jurors must be "sober, discreet and judicious freeholders,… lawful men of fair

State constitutions protecting the right to bear arms do not follow a similar pattern. Between 1790 and 1820, nine states enacted their own right-to-arms provisions in their constitutions. *See* Volokh, 11 TEX. REV. L. & POL. at 208–09 (four more had enacted such provisions prior to 1790). None of those provisions made an exception for criminals. *Id.* And notably, seven of those nine states explicitly excluded or authorized the exclusion of certain criminals from the right to vote. *Compare id.* (identifying Kentucky, Ohio, Indiana, Mississippi, Connecticut, Alabama, and Missouri as seven of the nine states with right-to-arms provisions in their constitutions by 1820), *with* KEYSSAR, *supra*, at tbl. A.7 (the same seven state constitutions specifically excluded certain criminals from the right to vote). The same pattern held true in 1857. *Compare* Volokh, 11 TEX. REV. L. & POL. at 209–10, *with* KEYSSAR, *supra*, at tbl. A.7. There is no basis, then, for assuming that a virtue requirement on the right to vote applies equally to the right to keep and bear arms. *See Binderup*, 836 F.3d at 372 (Hardiman, J., concurring in part and concurring in the judgments) ("We have found no historical evidence on the public meaning of the right to keep and bear arms indicating that 'virtuousness' was a limitation on one's qualification for the right—contemporary insistence to the contrary falls somewhere between guesswork and *ipse dixit*.").[12]

---

characters"); Act of Dec. 17, 1796, § 52, *in* ACTS FOR THE COMMONWEALTH OF KENTUCKY 134 (Stewart 1796) (jurors must "be of good demeanor").

[12] The fact that the first general prohibition on felon gun possession was not enacted until 1961 further undercuts the argument that either history or tradition supports a virtue-based restriction on the right. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757

In sum, the available evidence suggests that the right to arms differs from rights that depend on civic virtue for enjoyment. The Second Amendment confers an individual right, intimately connected with the natural right of self-defense, and not limited to civic participation (i.e., militia service). By the very terms of the civic-rights argument, then, the right to arms would have been "treated differently" than rights like the right to vote or to sit on juries. *See* Cornell, 29 N. KY. L. REV. at 679 ("[R]ights belonging to individuals … were treated differently than were civic rights such as militia service, or the right to sit on juries."). And that difference is borne out by historical treatment: we see no explicit criminal, or even more general virtue-based, exclusions from the right to bear arms like we do in other contexts. Thus, although the right protected by the Second Amendment is not unlimited, *see Heller*, 554 U.S. at 595, its limits are not defined by a general felon ban tied to a lack of virtue or good character.

III.

The history canvassed in Part II yields two conclusions that are important for present purposes. History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons. But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous. Our precedent is consistent with this principle: we have held that "Congress is not limited to case-by-case exclusions of persons who have been shown to be

---

(1961) (amending the Federal Firearms Act by "deleting the words 'crime of violence' … and inserting in lieu thereof the words 'crime publishable by imprisonment for a term exceeding one year'").

untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Skoien*, 614 F.3d at 641. Instead, the legislature can make that judgment on a class-wide basis. *See id.* at 640 ("That *some* categorical limits are proper is part of the original meaning, leaving to the people's elected representatives the filling in of details."). And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety; as we said in *Skoien*, "exclusions need not mirror limits that were on the books in 1791." *Id.* at 641. Such restrictions are "lineal descendants" of historical laws banning dangerous people from possessing guns. *See* Transcript of Oral Argument at 77, *Heller*, 554 U.S. 570 (No. 07–290) (Chief Justice Roberts: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well.").

That said, "the government does not get a free pass simply because Congress has established a 'categorical ban.'" *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010). The government could quickly swallow the right if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun. *See Skoien*, 614 F.3d at 641 ("We do not mean that a categorical limit on the possession of firearms can be justified under the rational-basis test, which deems a law valid if any justification for it may be imagined."). The legislature must be able to justify its designation, and the rigor with which we review this justification "depends on 'how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right.'" *Ezell II*, 846 F.3d at 892 (citation omitted). "Severe burdens on the core right of armed defense

require a very strong public-interest justification and a close means-ends fit …." *Id.*

The majority contends that the means-end review should be "arguably less rigorous in this case because … felon dispossession laws do not restrict the 'core right of armed defense,' but rather burden 'activity lying closer to the margins of the right.'" Maj. Op. at 20 n.10 (quoting *Ezell II*, 846 F.3d at 892). I disagree. First, felon dispossession statutes target the whole right, including its core: they restrict even mere possession of a firearm in the home for the purpose of self-defense. *Cf. Heller*, 554 U.S. at 630–35 (finding unconstitutional a law that made it impossible for citizens to use firearms for "the core lawful purpose of self-defense"); *id.* at 628 ("[T]he inherent right of self-defense has been central to the Second Amendment right.").[13] And second, the burden is severe: it is a *permanent* disqualification from the exercise of a fundamental right. *See* Maj. Op. at 2–4; *see also United States v. McCane*, 573 F.3d 1037, 1048–49 (10th Cir. 2009) (Tymkovich, J., concurring) ("[T]he broad scope of § 922(g)(1)—which *permanently* disqualifies *all* felons from possessing firearms—would conflict with the 'core' self-

---

[13] The majority suggests that *who* exercises the right changes *what* the core of the right is, *see* Maj. Op. at 20 n.10, but that is circular. *Heller* distinguishes the two inquiries: First, it held that the District of Columbia's ban on handgun possession violated the Second Amendment (the *what*). 554 U.S. at 635. Then, it indicated the need to consider whether Heller could be disqualified from exercising that right (the *who*). *Id.* ("Assuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license to carry it in the home."). Heller's qualification or lack thereof did not change the content of the right itself; it affected whether the legislature could take it away. The same is true of Kanter here.

defense right embodied in the Second Amendment."). Thus, "a very strong public-interest justification and a close means-ends fit" is required before Kanter may be constitutionally subject to the United States and Wisconsin dispossession statutes. *Ezell II*, 846 F.3d at 892.

There is no question that the interest identified by the governments and supported by history—keeping guns out of the hands of those who are likely to misuse them—is very strong. And we have held that several of the other categorical bans within § 922(g) demonstrate the necessary fit between this public-safety end and the government's chosen means. In *Skoien*, we upheld § 922(g)(9), which prohibits those convicted of domestic violence misdemeanors from possessing firearms, because "no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important governmental objective" and "[b]oth logic and data establish a substantial relation between § 922(g)(9) and this objective." 614 F.3d at 642; *see also id.* at 644 ("[N]o matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners."). In *United States v. Yancey*, we sustained § 922(g)(3), which prohibits any person "who is an unlawful user of or addicted to any controlled substance" from possessing a gun, because "studies amply demonstrate the connection between chronic drug abuse and violent crime, and illuminate the nexus between Congress's attempt to keep firearms away from habitual drug abusers and its goal of reducing violent crime." 621 F.3d 681, 686 (7th Cir. 2010). And in *United States v. Meza-Rodriguez*, we rejected a challenge to § 922(g)(5), which prohibits aliens unlawfully present in the United States from possessing firearms, reasoning that keeping guns out of the hands of "persons who are difficult to track and who have an interest in eluding law

enforcement" serves the public-safety objectives of § 922(g). 798 F.3d 664, 673 (7th Cir. 2015).

In contrast to these narrowly defined categorical bans, § 922(g)(1), which applies to *all* felons, is "wildly overinclusive." Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683, 721 (2007). Its application is not limited to those who have committed violent crimes like murder, assault, and rape.[14] It also encompasses those who have committed *any* nonviolent felony or qualifying state-law misdemeanor—and that is an immense and diverse category. It includes everything from Kanter's offense, mail fraud, to selling pigs without a license in Massachusetts, redeeming large quantities of out-of-state bottle deposits in Michigan, and countless other state and federal offenses. *See* Mass. Gen.

---

[14] Section 922(g)(1)'s predecessor, the Federal Firearms Act of 1938, did not permanently ban all felons from possessing firearms, but rather those convicted of "crime[s] of violence," defined then as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking," and certain forms of aggravated assault. *See* Marshall, 32 HARV. J.L. & PUB. POL'Y at 698–99 (citing Federal Firearms Act, ch. 850, § 1(6), 52 Stat. 1250, 1250 (1938)). Even today, many scholars cited as supporting a general felon ban actually seem to assume or advocate something much closer to a *violent*-felon ban. *See, e.g.*, Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 HASTINGS L. J. 1339, 1362–63 (2009) ("At early common law, the term 'felony' applied only to a few very serious, very dangerous offenses such as murder, rape, arson, and robbery.... Insofar as federal or state statutes would seek to bar arms possession by [felons who 'pos[e] no physical danger to others'], those laws would seem to be invalid on their face."); Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right to "Bear Arms"*, 49 LAW & CONTEMP. PROBS., Winter 1986, at 151, 161 ("[V]iolent criminals, children, and those of unsound mind may be deprived of firearms ...." (emphasis added)).

Laws ch. 129, §§ 39, 43; Mich. Comp. Laws § 445.574a(1)(a), (2)(d); *see also, e.g.*, 21 U.S.C. § 676 (violating the Federal Meat Inspection Act in certain ways); 18 U.S.C. § 1621 (committing perjury); Mass. Gen. Laws ch. 266, § 30A (shoplifting goods valued at $100).[15] These crimes, like many others captured by § 922(g), "rais[e] no particular suspicion that the convict is a threat to public safety." Winkler, 105 MICH. L. REV. at 721. Put more colorfully, "It is hard to imagine how banning Martha Stewart or Enron's Andrew Fastow from possessing a gun furthers public safety." *Id.*

We have addressed the constitutionality of § 922(g)(1) before. In *United States v. Williams,* a defendant with a prior robbery conviction challenged the statute as applied to him. 616 F.3d at 691. We held that the provision is constitutional as applied to violent felons, including the defendant in that case. 616 F.3d at 694 ("Because Williams was convicted of a violent felony, his claim that § 922(g)(1) unconstitutionally infringes on his right to possess a firearm is without merit."). But our decision came with an important qualification: we expressly noted that "§ 922(g)(1) may be subject to an overbreadth challenge at some point because of its disqualification of all felons, including those who are non-violent." *Id.* at 693. We asserted that "[e]ven if the government may face a difficult

---

[15] It's worth noting that, in addition to the eclectic and wide-ranging offenses already included in this category, there are very few limits on the ability of Congress and state legislatures to expand the number of qualifying nonviolent offenses. *Cf. United States v. Phillips*, 827 F.3d 1171, 1176 n.5 (9th Cir. 2016) ("Can Congress or the States define petty larceny as a felony? Of course. Can a conviction for stealing a lollipop then serve as a basis under § 922(g)(1) to a ban a person for the rest of his life from ever possessing a firearm, consistent with the Second Amendment?").

burden of proving § 922(g)(1)'s 'strong showing' in future cases, it certainly satisfies its burden in this case, where [the defendant] challenges § 922(g)(1) as it was applied to him." *Id.* As a violent felon, the defendant in *Williams* was in no position to challenge § 922(g)(1) on the ground that its application to nonviolent felons is unconstitutional. *See Skoien*, 614 F.3d at 645 ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."). As a nonviolent felon, however, Kanter is in a position to make that argument.

The first step in analyzing Kanter's as-applied challenge is to consider whether banning all nonviolent felons is substantially related to the governments' interest in preventing future gun violence. *See Williams*, 616 F.3d at 692–93. *Williams* held that because the characteristic common to all violent felons is a demonstrated propensity for violence, the ban on possessing firearms is constitutional as applied to all members of that class. *Id.* at 693–94. In contrast, and to state the obvious, the characteristic common to all nonviolent felons is that their criminal conduct was nonviolent.[16] Thus, the reasoning that supports the categorical disarmament of

---

[16] The majority suggests that nonviolent felonies are united by another characteristic relevant to the constitutionality of disarmament: that the commission of "*mala in se* felonies reflect[s] grave misjudgment and maladjustment." Maj. Op. at 24 (citation omitted). But that is just another way of saying that nonviolent felons have demonstrated a lack of virtue. Absent evidence that this lack of virtue is tied to a propensity for risky behavior that threatens public safety, it does not justify stripping them of their Second Amendment rights.

violent felons—that past violence is predictive of future violence—simply does not apply.

The governments argue, though, that being convicted of a nonviolent crime is also predictive of future violence. They try to support that position with statistics showing that nonviolent felons are likely to commit violent crimes in the future. These statistics are entirely unhelpful, however, because they lump all nonviolent felons together—and while some nonviolent felons may be likely to misuse firearms, the characteristics that make them risky cannot be generalized to the whole class. For example, the characteristics of an individual convicted of a drug-related offense tell us little if anything about the tendency of an individual convicted of perjury—or, for that matter, mail fraud—to commit gun violence. The sheer diversity of crimes encompassed by these statutes makes it virtually impossible for the governments to show that banning *all* nonviolent felons from possessing guns is closely tailored to the goal of protecting the public safety. Thus, we must decide whether the statutes are unconstitutional as applied to Kanter in particular. *See Williams*, 616 F.3d at 692–93.

If Kanter's conviction—mail fraud—is substantially related to violent behavior, the governments can disarm him without regard to any personal circumstances or characteristics suggesting that he poses a low risk to public safety. But their case for tying mail fraud to a risk of future violence rests on a single study related to mail-fraud recidivism. *See* DAVID WEISBURD ET AL., WHITE-COLLAR CRIME AND CRIMINAL CAREERS (2004). This study suggests that almost 40% of individuals convicted of mail fraud were later rearrested. *Id.* at 29. It does not say, however, whether those

arrests were for violent or nonviolent offenses. Nor does it say what percentage of those individuals were convicted. A different portion of the same study suggests that 25% of all white-collar repeat offenders (on the numbers provided, I'll assume that means roughly 10% of those with a mail-fraud conviction, though we have been given no way to know)[17] have an arrest for a violent crime. *Id* at 45. But it does not specify whether the violent arrest preceded or post-dated the white-collar arrests, and the numbers drop dramatically for those with only two total offenses, *id.*, suggesting that a pattern of criminality, rather than a particular mail-fraud arrest, might be an indication of future dangerousness, *see id.* at 46 ("[T]hose with fewer arrests seldom had violent crimes in their criminal histories."). This study falls well short of establishing the "close means-ends fit" required before the governments may totally and permanently strip offenders like Kanter of the ability to exercise a fundamental right.[18]

This does not mean that Wisconsin and the United States cannot disarm Kanter. Even though the mail-fraud conviction, standing alone, is not enough, they might still be able to show that Kanter's history or characteristics make him

---

[17] This assumes that the rate of violent arrest for mail fraudsters who reoffend tracks that of all white-collar criminals who reoffend. The governments' study doesn't speak to this question, underscoring the inability of the data provided to support the governments' arguments.

[18] My analysis is limited to the total bans that Congress and the Wisconsin legislature enacted. It might be that this study or other evidence would support other, more limited intrusions on Kanter's Second Amendment right. But the constitutionality of a more limited measure (for example, a temporary ban or one that limits the places in which Kanter can have a gun) is not presented by this case.

likely to misuse firearms. And if banning Kanter, in particular, from possessing a gun is substantially related to the governments' goal of "preventing armed mayhem," then the statutes could be constitutionally applied to him. *Skoien*, 614 F.3d at 642.

At this point, however, neither Wisconsin nor the United States has presented any evidence that Kanter would be dangerous if armed. Instead, as the majority notes, "Kanter is a first-time, non-violent offender with no history of violence, firearm misuses, or subsequent convictions," and he is "employed, married, and does not use illicit drugs, all of which correspond with lower rates of recidivism." Maj. Op. at 23. Absent evidence that Kanter would pose a risk to the public safety if he possessed a gun, the governments cannot permanently deprive him of his right to keep and bear arms.

* * *

If the Second Amendment were subject to a virtue limitation, there would be no need for the government to produce—or for the court to assess—evidence that nonviolent felons have a propensity for dangerous behavior. But *Heller* forecloses the "civic right" argument on which a virtue limitation depends. And while both Wisconsin and the United States have an unquestionably strong interest in protecting the public from gun violence, they have failed to show, by either logic or data, *cf. Skoien*, 614 F.3d at 642, that disarming Kanter substantially advances that interest. On this record, holding that the ban is constitutional as applied to Kanter does not "put[] the government through its paces," *see Williams*, 616 F.3d at 692, but instead treats the Second Amendment as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights

guarantees," *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion). I therefore dissent.